E. ERIC [illegible] BURTON #E02320
P.O. BOX 5246 - CSATF/SP-C1-132L
CORCORAN, CALIFORNIA 93212
IN PRO PER

EXHIBIT "D" PAGES ~~1-115~~ 1-101

R.T. EXCERPTS; 0132, 0133, 103, 104, 105, 106, 107, 150, 173, 323, 324, 325, 326, 327, 328, 161, 0073, 153, 154, 164, 165, 166, 330, 331, 0026

0132

U S Cal 1963 Evidence seized during unlawful search cannot constitute proof against victim of search, and exclusionary prohibition extends to indirect as well as to direct products of such invasions. Wong Sun v. U.S. 83 S.Ct 407

U S Cal 1963 Verbal evidence which derives immediately from unlawful entry and unauthorized arrest is no less the "fruit" of official illegality than more common tangible fruits of unwarranted intrusion and 4th amendt. may protect against overhearing of verbal statements as well as against more traditional seizure of papers and effects. Fed. Rules. Crim. Proc rules 3,4,18 U.S.C.A; U S C A Const. amend. 4 Wong Sun 83 S. ct

U S Cal 1963 Test of excludability is not whether evidence would'nt have come to light but for illegal action of Police but whether evidence was come at by exploitation of illegality rather than by means sufficiently distinguishable to be purged of primary taint. Wong Sun.

U.S. cal 1963 Narcotics found in home of another person after illegally arrested defendant denied selling narcotics but told arresting officers that such person had been selling narcotics were come by exploitation of illegality and could not be used against defendant. Wong Sun, U S 83 S.Ct.

Police Officer is permitted to arrest without warrant if misdemeanor or felony is committed in officers presence. Hagland v. City of San Diego, 911 F 2d 377

Ca Cal 1997 Proximity between home and area purportedly within curtilage protected by fourth amendment is not determative, as there is no fixed distance at which curtilage begins or ends U.S. C.A. Amend 4 US v. Soliz 129. F.3d 499.

C A Cal 1997 Fourth Amendment protects curtilage of home and extent curtilage is determined by whether individual may reasonably expect that area in question should be treated as home itself. U.S.C.A. Const amend 4 U.S v Soliz 129 F.3d 499.

argument cont 0133

Ca Cal 2004 Under, the traditional rule probable cause exist when there is fair probability or substantial chance of Criminal activity, the Court of appeals looks at the total circumstances known to the officer to determine whether probable cause existed U.S.C.A. Const. Amend. 4 U.S. v. Brooks 367 F.3d 1128.

Ca 9 cal 2003 Police Officer may not solely rely on claim of citizen witness that he was victim of Crime to establish probable cause for arrest, but must independently investigate basis for victims knowledge or interview other witnesses; sufficient basis of knowledge is established if victim provides facts sufficiently detailed to cause reasonable person to believed crime has been commited and named suspect was perpetrator Peng V. Mei Chin Penghu, 335F U.S. Const. Am.

Ca 9 Cal 1974 - Evidence obtained in search incident to arrest under unconstitutional Vagrancy ordinance should have been excluded at murder trial where state did not demonstrate beyond a reasonable doubt that admission of the ALLEGED murder weapon which was unlawfully seized did not contribute to the conviction. Powell V. Stone 507 F.2d 93 certiorari granted.

Ca. Cal 1973 Evidence which was fruit of illegal arrest was inadmissable against arrested person U.S. v. Connolly 479 F 2d 930 Certiorari dismissed 94 S.CT 248, 414

Use of ALLEGED Confessions ALLEGED as denying due process (1942) 15 S. CAL L. Rev



THE COURT: ALL RIGHT. MY TENTATIVE IS AS FOLLOWS: [redacted] [redacted] [redacted]. AND THE TENTATIVE IS BASED UPON THE AUTOMOBILE EXCEPTION TO THE FOURTH AMENDMENT. MY TENTATIVE IS FURTHER TO GRANT THE MOTION TO SUPPRESS EVIDENCE FROM APARTMENT NO. 5, CONCLUDING THAT THE PEOPLE, AFTER A FULL CONSIDERATION AND REVIEW OF THE EVIDENCE PRESENTED, HAVE NOT MET THEIR BURDEN OF DEMONSTRATING TO THE COURT'S SATISFACTION THAT THE ENTRY, SEARCH AND SEIZURE OF ITEMS WITHIN THE APARTMENT WAS DONE PURSUANT TO A CONSENT RENDERED BY MR. BURTON.

I UNDERSTAND THERE'S CERTAIN OTHER ITEMS THAT MR. BURTON WOULD LIKE SUPPRESSED FLOWING FROM HIS ARREST. [redacted]. THE ONLY ITEMS THAT I'M TALKING ABOUT AS SUPPRESSING ARE WHATEVER WAS FOUND IN OR DERIVED FROM APARTMENT NO. 5, PERIOD.

MR. ADAIR -- WELL, MISS HANNAH, YOU'VE GOT THE LABORING OAR ON THE MOTION SINCE THIS WAS A WARRANTLESS SEARCH, MINDFUL OF THE COURT'S TENTATIVE, DO YOU WISH TO BE HEARD?

MS. HANNAH: I DO, YOUR HONOR.

YOUR HONOR, REPRESENTING THIS POINT, [redacted] [redacted], THE POLICE OFFICERS TESTIFIED AFTER TAKING THE DEFENDANT INTO CUSTODY THAT THEY APPROACHED HIM, [redacted].

THE COURT: [redacted] TOOK HIM DOWN, [redacted]. THERE WAS NO



1   CONVERSATION, TESTIMONY OF A CONVERSATION AT THE PATROL

2   VEHICLE ABOUT A CONSENT TO SEARCH.  AND THE WAY I VIEW IT IS

3   THAT THE COPS DON'T HAVE THEIR ACT TOGETHER, AND HOWEVER IT

4   WENT DOWN, THEY EITHER HAVE A VERY POOR RECOLLECTION OR

5   FAILURE OF RECOLLECTION.  AND I DO NOT CONCLUDE FROM THE

6   TESTIMONY OF MR. HELSEL THAT THERE WAS CONSENT NECESSARILY

7   GIVEN BY MR. BURTON DURING WHAT MR. HELSEL DESCRIBED AS A

8   DIALOGUE AT THE PATROL VEHICLE THAT HE WAS NOT IN A POSITION

9   TO HEAR.  THE TESTIMONY OF AGENT KIRK WAS CLEARLY THAT THE

10  PURPORTED CONSENT TO SEARCH WAS GIVEN BY MR. BURTON RIGHT

11  THERE IN THE PARKING LOT BEFORE HE WAS EVER ESCORTED TO THE

12  PATROL VEHICLE.  AND BASED UPON THE TESTIMONY OF OFFICER

13  HOLMES, ~~████████████████████████~~, I'M SATISFIED

14  IT DIDN'T GO DOWN THAT WAY.

15          MS. HANNAH:  YOUR HONOR, AGENT KIRK INDICATED

16  ~~████████████████████████████████████████~~

17  ~~████████████████████████████████~~

18          THE COURT:  YOU'VE GOT TO READ THIS IN CONTEXT

19  AND VIEW IT IN CONTEXT.  I'VE REVIEWED THE TRANSCRIPT AND

20  I'VE REVIEWED MY DETAILED NOTES.

21          MS. HANNAH:  ~~████████████████████████~~

~~████████████████████████████████████████~~

23  ~~████████████~~.  I MEAN, ~~██████████████████████~~

24  ~~████████████████████████████████████~~

25  ~~████████████████████████████████████~~

26  ~~████████████████████████████████~~ --

27  ~~████████████~~, THEY TOOK HIM INTO CUSTODY, THEY PUT HIM

28  INTO HANDCUFFS. ~~████████████~~





ALL OF THOSE THINGS --

THE COURT: I'M NOT SATISFIED THERE WAS A CONSENT, WHETHER FREE OR VOLUNTARY OR OTHERWISE. THAT'S MY POINT. THE EVIDENCE DOESN'T COME TOGETHER TO CLEANLY SUPPORT YOUR ARGUMENT OR HOW THIS WENT DOWN.

MS. HANNAH: YOUR HONOR,

CIRCUMSTANCES --

THE COURT: NO, . AS I UNDERSTAND IT, MR. ADAIR, ARE YOU CONCEDING THERE WAS A CONSENT GIVEN AND THE ONLY ISSUE IS THE VOLUNTARINESS OF THE CONSENT?

MR. ADAIR: NO, YOUR HONOR. WE'RE SAYING THAT HE NEVER CONSENTED.



THE COURT: PERIOD.

MS. HANNAH: YOUR HONOR, AGENT KIRK HAS TESTIFIED THAT --

THE COURT: I'M MINDFUL OF AGENT KIRK'S TESTIMONY.

MS. HANNAH: AND THE CIRCUMSTANCE AND EVEN THE SURROUNDING CIRCUMSTANCES WITH THE PEOPLE'S WITNESSES AND

THE COURT: I'VE LOOKED AT ALL OF IT. I'M NOT PERSUADED.

MR. ADAIR, YOU WISH TO BE HEARD?

MR. ADAIR: NO, YOUR HONOR. WE'LL SUBMIT.

THE COURT: THE MOTION TO SUPPRESS IS GRANTED IN PART FOR THE REASONS OUTLINED BY THE COURT. THE MOTION TO SUPPRESS ITEMS FROM THE VEHICLE IS DENIED, NOT BASED UPON A PURPORTED THEORY OF CONSENT, BUT RATHER BASED UPON THE AUTOMOBILE EXCEPTION TO THE 4TH AMENDMENT. THE MOTION TO SUPPRESS IS GRANTED, BUT LIMITED, AS I'VE SAID, TO ITEMS

DERIVED FROM A LAW ENFORCEMENT ENTRY AND SEARCH OF UNIT 5, THAT BEING SHOWN BY THE EVIDENCE TO BE MR. BURTON'S APARTMENT, AS TO WHICH RESIDENCE, OF COURSE, HE HAD STANDING UNDER THE 4TH AMENDMENT TO OBJECT PRESENTLY TO THE SEARCH THEREOF AND THE SEIZURE OF ITEMS THEREFROM.

THIS CASE REMAINS ON THE TRIAL CALENDAR NEXT DOOR ON MONDAY, MARCH 14TH. IF THERE'S NOT A READINESS CONFERENCE ALREADY SET IN THE INTERIM, I'M GOING TO SET ONE PRESENTLY. AND, MR. ADAIR, I LEAVE THAT TO YOUR DISCRETION



AS TO SELECTING A DATE, MONDAY, TUESDAY OR WEDNESDAY MORNING AT 9:30 BETWEEN NOW AND THE TRIAL DATE.

MR. ADAIR: YOUR HONOR, I WOULD SUGGEST THE WEEK OF MARCH 7TH. THE BEST DAY FOR ME WOULD BE THE 9TH, BUT I KNOW MISS HANNAH HAS A NUMBER OF THINGS SCHEDULED, SO REQUEST SOMETHING THAT'S CONVENIENT TO HER ALSO.

THE COURT: MISS HANNAH.

MS. HANNAH: YOUR HONOR, I HAVE EITHER THE 7TH OR THE 8TH. I WILL NOT BE AVAILABLE THE 9TH, 10TH OR 11TH.

THE COURT: CAN YOU SQUEEZE IT ON THE 7TH OR 8TH, MR. ADAIR?

MR. ADAIR: THE 7TH IS PROBABLY THE WORST. I HAVE SOMETHING IN FEDERAL COURT THE MORNING OF THE 8TH. I'LL SEE WHAT I CAN DO ABOUT CHANGING IT.

THE COURT: LET'S SET IT FOR MARCH 8TH, TUESDAY, AT 9:30 IN DEPARTMENT 11 FOR READINESS CONFERENCE WITH THE UNDERSTANDING THAT IF YOU GET HUNG UP OR DELAYED IN FEDERAL COURT, JUST GIVE DEPARTMENT 11 A CALL. I'M SURE THEY'LL TRAIL IT TO YOUR CONVENIENCE.

MR. ADAIR: THAT'S FINE, YOUR HONOR. APPRECIATE IT. THANK YOU.

THE COURT: THANK YOU.

---



BECAUSE -- CAN I HAVE A MOMENT, YOUR HONOR?

THE COURT: SURE.

MR. ADAIR: WE'RE REQUESTING THE CASE BE DISMISSED AS THE FACTS OF THE CASE HAVE NOT BEEN SUBSTANTIATED -- THE CHARGES HAVE NOT BEEN SUBSTANTIATED BY THE FACTS OF THE CASE.

THE COURT: WELL, AS TO THAT MOTION, OF COURSE, WE ALREADY HAVE THE 995 MOTION. AND THAT WAS DENIED. AND THAT WAS BASED ON THE EVIDENCE AT THE PRELIMINARY HEARING. AND THE NEXT STAGE FOR THE COURT TO CONSIDER -- ACTUALLY, THAT'S WHY WE HAVE THE TRIAL, TO DETERMINE IF THERE'S SUFFICIENT EVIDENCE TO PROVE THE CASE BEYOND A REASONABLE DOUBT.

SO THE COURT WILL NOT GRANT THE MOTION TO DISMISS, BUT THAT'S THE PURPOSE OF HAVING A JURY TRIAL. THEY WILL MAKE THE DETERMINATION.

WITH REGARD TO THE OTHER ISSUE OF THE WITNESS, I'M LOOKING AT THE PRELIM AND I SEE THAT THE COURT -- DEFENSE RAISED A MOTION TO EXCLUDE WITNESSES, THAT THE COURT ASKED THE WITNESSES IN THE COURTROOM TO BE IDENTIFIED. MS. SANDERS WAS IDENTIFIED AND HER DAUGHTER DREONA, AS WELL AS OTHERS. AND THE COURT ASKED THEM TO ALL STEP OUT IN THE HALL.

SO IT APPEARS, AT LEAST AS OF PAGE 3 OF THE PRELIM, THAT THE WITNESS WAS INSTRUCTED TO STEP OUT IN THE HALL. I DON'T HAVE ANY EVIDENCE AS TO WHETHER SHE EVER CAME BACK INTO THE COURTROOM. NOTHING -- UNLESS SOMEONE POINTS ME TO A PAGE IN THE PRELIM WHERE THAT'S REFLECTED. IF NOT, THEN I DON'T HAVE ANY EVIDENCE OF THAT. BUT EVEN IF SHE DID, THE -- NUMBER ONE, SHE WAS IDENTIFIED TO EVERYONE AT THE OUTSET. SO IT WOULD HAVE BEEN INCUMBENT UPON COUNSEL TO CALL IT TO THE COURT'S



DENY IT AGAIN.

MR. ADAIR: COULD I HAVE A MOMENT, YOUR HONOR?

THE COURT: YES.

(COUNSEL AND THE DEFENDANT CONFER.)

MR. ADAIR: I GUESS A FURTHER TROMBETTA MOTION [redacted] HE WAS DOING OTHER THINGS; [redacted]

THE COURT: ALL RIGHT. ANY RESPONSE TO THAT?

[redacted]

MR. TROCHA: I MEAN, [redacted] CELL PHONE, I DON'T KNOW. BUT I VIEWED THE EVIDENCE [redacted].

MR. ADAIR: IS THIS THE CELL PHONE THAT BELONGED TO MR. BURTON?

MR. TROCHA: I DON'T KNOW WHO IT BELONGED TO. [redacted]

THE COURT: OKAY. [redacted]. AND I DON'T HAVE SUFFICIENT EVIDENCE AT THIS POINT -- PARTICULARLY UNDER A TROMBETTA MOTION -- SO



THAT MOTION IS DENIED.

(COUNSEL AND THE DEFENDANT CONFER.)

**MR. ADAIR:** THERE IS ONE OTHER WITNESS APPARENTLY, ACCORDING TO MR. BURTON, [redacted] AND THAT'S A BARBARA SAVAGLIO, [redacted] IS S-A-V-A-G-L-I-O.

**THE COURT:** MS. SAVAGLIO. ALL RIGHT. THANK YOU.

THEN DOES THAT CONCLUDE THE MOTIONS THAT WE NEED TO HEAR AT THIS TIME?

**MR. ADAIR:** AS I HAD STATED EARLIER -- I THINK IT WAS IN CHAMBERS -- CONCERNING THE SEARCH OF THE CAR, [redacted]

NOW, I THINK WE RAISED THOSE IN FRONT OF JUDGE PRECKEL WAY BACK IN FEBRUARY OR WHATEVER IT WAS. HE DENIED THE SUPPRESSION MOTION CONCERNING THE CAR. I THINK HE INCLUDED THE BACKPACK. I'M NOT SURE. BUT BASED UPON AN "AUTOMOBILE EXCEPTION," AS HE STATED.

I'D LIKE TO RENEW THAT SUPPRESSION MOTION AND [redacted] WOULD POINT OUT THAT I THINK THE DEFENSE MAY BE RAISING -- EITHER PRESENTING THE PHOTOGRAPHS OF THE





**THE COURT:** AND I HAVE -- LOOKING THROUGH THE RECORD HERE, I'VE GOT THE PRELIM TRANSCRIPT AND TRANSCRIPTS FROM JANUARY 28TH. IT LOOKS LIKE THEN JUDGE PRECKEL RULED ON FEBRUARY 24TH, MADE HIS FINAL RULING ON THE MOTION. SPECIFICALLY SAYS HE "GRANTED AS TO EVIDENCE OBTAINED IN DEPARTMENT 5, DENIED AS TO ANY ITEMS OBTAINED FROM THE VEHICLE." I WOULD THINK IF THE BACKPACK WAS ON TOP OF THE VEHICLE, THAT INCLUDED THE BACKPACK.

**THE COURT:** ALL RIGHT. AND WHAT'S YOUR RESPONSE, MR. TROCHA?

**MR. TROCHA:** YOUR HONOR, I'D RELY ON JUDGE PRECKEL'S RULING.



~~MR. TROCHA:~~

TOOK PICTURES OF THE CAR AS IT WAS AT THE SCENE AT HIS HOUSE; TOWED THE CAR BACK TO THE EL CAJON POLICE DEPARTMENT, AND TOOK PICTURES THERE.

**MR. ADAIR:** PERHAPS TO SUPPLEMENT THE RECORD, AT THE TIME OF THE SUPPRESSION MOTION, WE DID NOT HAVE PHOTOGRAPHS. THERE IS A PHOTOGRAPH OF MR. BURTON'S CAR AS IT'S PARKED DIRECTLY IN FRONT OF HIS UNIT.

IT'S OUR POSITION THAT THE CAR WAS PART OF THE CURTILAGE OF MR. BURTON'S RESIDENCE AND COULD NOT BE SEARCHED WITHOUT A SEARCH WARRANT.

**THE COURT:** AND WHERE WAS IT PARKED EXACTLY?

**MR. ADAIR:** IT WAS PARKED APPARENTLY DIRECTLY IN FRONT OF HIS UNIT. I THINK THAT'S WHAT THE PHOTOGRAPH WOULD SHOW.

**THE COURT:** IF YOU WANT TO SUBMIT THE PHOTOGRAPHS FOR THE RECORD, YOU MAY DO THAT.

(MR. ADAIR REVIEWS THE PHOTOGRAPHS.)



MR. ADAIR: YES, YOUR HONOR. THANK YOU.

THE COURT: ALL RIGHT. . PHOTO OF DEFENDANT'S VEHICLE, WAS MARKED FOR IDENTIFICATION.)

MR. ADAIR: COULD I EXPLAIN THE PICTURE?

THE COURT: DID YOU SHOW IT TO MR. TROCHA?

MR. TROCHA: I'VE SEEN THE PICTURE, YOUR HONOR.

THE COURT: ALL RIGHT. IF YOU WANT TO EXPLAIN FOR THE RECORD, WHAT IT DEPICTS AND WHAT WOULD BE

MR. ADAIR: I THINK WE CAN STIPULATE FACTS

MR. TROCHA: IT'S ESSENTIALLY DEFENDANT'S CAR PARKED IN HIS PARKING SPACE. IT'S PROPERTY OF THE APARTMENT COMPLEX HE LIVES IN.

MR. ADAIR: DIRECTLY ON THE OTHER SIDE OF THE CAR -- -- IS MR. BURTON'S APARTMENT UNIT, WHICH WOULD BE SEEN OVER THE HOOD -- OVER THE TOP OF THE CAR. AND THE

CORRESPONDS, I BELIEVE, TO HIS UNIT.

13




BELIEVE THE MANAGER HAD TESTIFIED AT THE HEARING THAT HE WAS STANDING THERE IN FRONT OF HIS UNIT WITHIN A COUPLE OF FEET OF THE DOOR WHEN THE -- WITH MR. BURTON AT THE TIME THE POLICE ARRIVED.

FRONT OF THE MANAGER'S UNIT. THE CAR WAS PARKED IN MR. BURTON'S SPACE, IN FRONT OF MR. BURTON'S APARTMENT. AND IT'S OUR CONTENTION THAT MR. BURTON WAS NOT IN CONTACT WITH THE CAR. THE CAR IS PARKED IN THE CURTILAGE OF MR. BURTON'S APARTMENT AND NEEDED A SEARCH WARRANT TO BE SEARCHED.

**THE COURT:** ALL RIGHT. WELL, I THINK THE FIRST ISSUE TO ADDRESS WOULD BE TIMELINESS OF THE MOTION IN RAISING IT AT TRIAL. IT APPEARS THAT UNDER 1538.5(H), DEFENSE MAY BRING A RENEWAL OF A MOTION AT TRIAL IF NO OPPORTUNITY FOR THE MOTION EXISTED BEFORE TRIAL OR IF THE DEFENSE WAS PREVIOUSLY UNAWARE OF THE GROUNDS OF THE MOTION.

I DON'T THINK THAT EXISTS HERE. THE PHOTOGRAPH CERTAINLY EXISTED PRIOR TO -- BETWEEN THE TIME OF JUDGE PRECKEL'S RULING AND TODAY. AND I DON'T THINK THERE'S ANY PARTICULAR REASON EITHER THAT I'M HEARING WHY A PHOTOGRAPH COULDN'T HAVE BEEN PREPARED AND PRESENTED TO JUDGE PRECKEL. I BELIEVE THAT THAT PARTICULAR MOTION WAS CONTINUED A COUPLE OF TIMES OR TRAILED OVER VARIOUS DAYS.

SO UNLESS I AM PRESENTED WITH A REASON WHY THIS FALLS WITHIN SUBDIVISION H, I DON'T THINK





MS. HANNAH: UH-HUH.

THE COURT: OKAY. THEN LET'S TURN TO THE DEFENSE MOTIONS.

MS. HANNAH: ACTUALLY, YOUR HONOR, BEFORE WE -- I DIDN'T WRITE THIS MOTION BECAUSE I ACTUALLY STRUGGLED WITH IT. THE COURT IS AWARE THAT THERE WAS A 1538. AND THAT IT WAS GRANTED WITH REGARD TO THE ITEMS FOUND IN THE DEFENDANT'S RESIDENCE,

COURT'S PREVIOUS RULING SUBJECT TO THE 1538.

THE COURT: YOUR RESPONSE.

MR. ADAIR: TO CLARIFY THE ISSUE A LITTLE BIT MORE, I DID

LEE PLUMMER
4045 Bonita Rd. #202
Bonita, Calif. 91902
Telephone 619-267-1710

Attorney for Eric Burton

SUPERIOR COURT OF CALIFORNIA

COURT OF THE EAST COUNTY DIVISION

COUNTY OF SAN DIEGO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, vs. ERIC BURTON, Defendant. | No. SCE 238643<br>DECLARATION OF ERIC BURTON<br>Motion Date: November 5, 2004 |

I Eric Burton declare:

1. I am the defendant in this case.

2. On March 19, 2004 I was arrested.

3. My home was searched by the El Cajon Police and some items were taken from my home.

4. I did not consent to the search of my home.

5. I did not authorize the search of my home.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: 10-20-04

Eric Burton

ERIC BURTON

THE COURT: AND THE BASIS FOR THE WRIT IS AS TO WHAT LEGAL ISSUE?

MR. ADAIR: THE BASIS FOR THE WRIT IS THE DENIAL OF PART OF A MOTION TO SUPPRESS THAT WAS BROUGHT PRETRIAL IN JUDGE PRECKEL'S DEPARTMENT. THAT PART OF THE MOTION THAT HE DENIED REQUESTED THAT THE RESULTS OF THE SEARCH OF AN AUTOMOBILE BELONGING TO MY CLIENT AND THE SEARCH OF A BACKPACK THAT WAS ON THE TOP OF THE AUTOMOBILE -- HE BASICALLY STATED THAT THERE WAS THE AUTOMOBILE EXCEPTION TO THE REQUIREMENT TO HAVE A WARRANT, AND THEREFORE, DENIED OUR REQUEST TO SUPPRESS THAT EVIDENCE.

THE COURT: OKAY.

MS. HANNAH, ANY RESPONSE TO THAT REQUEST?

MS. HANNAH: [redacted], YOUR HONOR. I THINK THAT A PROPER WAY TO FILE A WRIT, OF COURSE, IS TO FILE IT WITH THE COURT OF APPEALS, AND THEN THEY WOULD BE THE AUTHORITY THAT WOULD GRANT THE STAY. [redacted] MOTION WAS HEARD, I BELIEVE -- AT LEAST THE COURT CAME BACK WITH ITS RULING -- ON FEBRUARY 28TH. [redacted]

THE COURT: ALL RIGHT.

MR. ADAIR: YOUR HONOR, CAN I RESPOND?

THE COURT: YES. BUT LET ME CONFIRM THE DATE. IT LOOKS



MS. HANNAH: IT STARTED ON JANUARY 28TH. THE RULING WAS --

THE COURT: THEN IT CARRIED OVER TO THE FOLLOWING MONDAY, IT LOOKS LIKE.

MR. ADAIR: IT WAS ACTUALLY CONTINUED INTO LATE FEBRUARY.

THE COURT: OH, OKAY. THERE WAS ANOTHER CONTINUANCE.

MS. HANNAH: THERE WAS.

THE COURT: ALL RIGHT. WELL, LET'S JUST PINPOINT THAT DATE, FOR THE RECORD.

MS. HANNAH: EXCUSE ME. I MISSPOKE. IT WAS FEBRUARY 24TH.

THE COURT: ALL RIGHT. I SEE THOSE MINUTES. SO THE MOTION WAS DENIED ON FEBRUARY 24TH.

MR. ADAIR, YOU HAD A BRIEF REPLY?

MR. ADAIR: MY CLIENT'S ALWAYS REQUESTED THAT I GO TO THE FOURTH DISTRICT ON THIS. IT WAS MY DECISION NOT TO DO IT. AND I THINK HE WOULD WANT IT ON THE RECORD THAT HE FROM PRETTY MUCH DAY ONE HAS REQUESTED A REVIEW. [illegible] SHOULD VINDICATE HIS RIGHTS IN THAT REGARD.

THE COURT: ALL RIGHT. WELL, I UNDERSTAND THAT. THE REQUEST FOR THE STAY IS DENIED. THE MOTION WAS RULED UPON FEBRUARY 24TH. [illegible]

ALSO, MR. BURTON WILL NOT BE DEPRIVED OF HIS APPELLATE RIGHTS. SHOULD THE CASE PROCEED ADVERSELY TO HIM AND HE WISHES TO APPEAL ON THOSE ISSUES, HE WILL CERTAINLY BE ABLE



THE COURT: OKAY. ALL RIGHT. THEN I THINK THAT COVERS THE PEOPLE'S MOTIONS FOR THE MOMENT.

AND LET'S TURN TO THE DEFENSE MOTIONS. AND LOOKING FIRST AT THE MOTION TO SUPPRESS DEFENDANT'S ALLEGED ADMISSIONS OR

THE AUDIO INTERVIEW. AND AS I UNDERSTAND IT, AT THIS POINT, THE PEOPLE ARE NOT PLANNING TO PRESENT THOSE STATEMENTS IN THEIR CASE-IN-CHIEF; IS THAT CORRECT?

MS. HANNAH: IT IS.

THE COURT: ALL RIGHT.

~~WOULD ANTICIPATE USING THOSE STATEMENTS IS IF THE DEFENDANT WERE TO TESTIFY, AND THEN TO USE IT AS IMPEACHMENT?~~

~~MS. HANNAH: YES.~~

THE COURT: ALL RIGHT. IN LIGHT OF THAT, I DON'T THINK I NEED TO RULE ON THE MOTION.

DO YOU AGREE?

MR. ADAIR: I BELIEVE THAT'S CORRECT, YOUR HONOR.

THE COURT: ALL RIGHT. DO YOU ANTICIPATE ANY MOTION OR -- I DON'T SEE ANYTHING IN HERE THAT WOULD GO TO BARRING PEOPLE'S [redacted], SUCH AS VOLUNTARINESS, WHICH I

MR. ADAIR: I BELIEVE MY CLIENT, WHO WOULD BRING A FURTHER ISSUE CONCERNING VOLUNTARINESS -- HIS POSITION IS THAT HE WAS, IN ESSENCE, TORTURED. THAT HE WAS PUT IN A PAPER SUIT, THAT HE WAS BAREFOOT, THAT HE WAS REFUSED THE RIGHT TO CALL AN ATTORNEY. AND THAT THERE WERE OTHER INFLICTIONS OF DISCOMFORT AND DISTRESS -- [redacted].

THE COURT: ALL RIGHT.

"VOLUNTARY" ALSO HAS A LAY MEANING THAT MIGHT BE VIEWED A LITTLE DIFFERENTLY BY MR. BURTON BECAUSE OBVIOUSLY HE WAS IN CUSTODY AND PROBABLY DIDN'T FEEL HE WAS FREE TO LEAVE,

I'M NOT BEING TOLD THAT THE PHOTOGRAPH DEPICTS SOMETHING THAT WAS DIFFERENT THAN THE UNDERSTANDING JUDGE PRECKEL HAD WHEN HE MADE THE RULING AND THE FINDING.

ALSO, IF THE PHOTOGRAPHS WERE AVAILABLE IN MARCH -- WE'RE NOW IN JULY, [redacted]HERE WOULD HAVE BEEN TIME TO PRESENT A MOTION BEFORE THE TRIAL. SO I DON'T BELIEVE THAT I DO HAVE JURISDICTION TO ENTERTAIN THE MOTION. AND EVEN IF I DID, THE THEORIES PREVIOUSLY EXPLAINED BY THE PEOPLE OF THE VEHICLE EXCEPTION AND [redacted] APPEAR TO APPLY. SO FOR ALL THOSE REASONS THE MOTION IS DENIED.

ANYTHING FURTHER, MR. ADAIR?

**MR. ADAIR:** IF I COULD HAVE A MOMENT.

(COUNSEL AND THE DEFENDANT CONFER.)

**MR. ADAIR:** I'LL HAVE TO CHECK AND SEE IF IT'S BEEN PREVIOUSLY PROVIDED, BUT WE NEED A COPY OF THE [redacted] 911 CALL TO THE DISPATCHER.

**MR. TROCHA:** AS TO THAT, I DO KNOW WHAT HAPPENED TO THE TAPES. MS. HANNAH INFORMED ME THAT WHEN THIS CASE ORIGINALLY CAME AROUND, [redacted]. THE TAPES WERE EVENTUALLY TAPED OVER. SO THERE ARE NO TAPES.

[redacted]

[redacted] 23



THE COURT: AND BY THE TIME REQUEST WAS MADE, IT WAS TOO LATE.

MR. TROCHA: THEY WERE INADVERTENTLY DESTROYED BY THE POLICE DEPARTMENT.

BUT AS TO THE EXACT WORDING OF THE CALL, WE DON'T HAVE THAT.

THE COURT: ALL RIGHT.

THERE'S NOTHING TO PRODUCE IF IT'S BEEN DESTROYED.

MR. ADAIR: WE'D ASK THE CASE BE DISMISSED FOR THE DESTRUCTION OF EVIDENCE THAT MIGHT TEND TO SHOW MR. BURTON'S INNOCENCE.

THE COURT: WELL, THAT MOTION WILL BE DENIED. AND I THINK THAT THAT MOTION HAS BEEN RAISED BEFORE IF MY MEMORY'S CORRECT. LET ME LOOK BACK. WELL, I DON'T

WE DID HAVE SOME DISCUSSION ON IT BEFORE, BUT IT DOES NOT APPEAR THERE WAS ANY INTENTIONAL DESTRUCTION. IT WAS INADVERTENTLY DESTROYED. AND THE MOTION IS DENIED.

ANYTHING FURTHER?

MR. ADAIR: WE'D ASK FOR PRODUCTION OF VIDEO FROM THE POLICE CARS.

THE COURT: IS THERE ANY EVIDENCE OR KNOWLEDGE THAT THERE IS SUCH VIDEOTAPE?

23



0026

by the law.

[redacted]

In this case, the following items have been set out for discovery:

[redacted]

The People have also requested the 911 tapes, all of the photographs, [redacted]. As the evidence continues to arrive at our office, copies will be made and set out for the defense.

**CONCLUSION**

The People have and will continue to comply with providing to defense counsel the discovery in this case. [redacted]

Dated: August 13, 2004

Respectfully submitted,

BONNIE M. DUMANIS
District Attorney

By: S. MARIA HANNAH
Deputy District Attorney
Attorneys for Plaintiff

**MR. TROCHA:** NOT THAT I KNOW OF, NOR DO I KNOW WHAT THE VIDEO WOULD BE OF.

**THE COURT:** WELL, AT THE TIME OF TRIAL, IT'S A LITTLE LATE FOR DISCOVERY REQUEST. SO THAT SHOULD HAVE BEEN MADE BEFORE. YOU CAN CERTAINLY INQUIRE OF THE OFFICERS WHEN THEY'RE HERE IF THERE IS ANY VIDEOTAPE.

MR. TROCHA, DID YOU HAVE ANYTHING ELSE?

**MR. TROCHA:** THERE WAS ONE THING, YOUR HONOR, AND THE 911 TAPES REMINDED ME. WE DO HAVE UNDER SUBPOENA THE DISPATCHER THAT MR. THOMAS WAS SPEAKING TO

BE SOME HEARSAY ISSUES.

MY REQUEST IS TO HAVE HER TESTIFY INITIALLY THAT SHE WAS TALKING TO MR. BURTON --

CONTEMPORANEOUS STATEMENT TO EXPLAIN THE ACTION.

**THE COURT:** IS THIS SOMEBODY YOU'RE PLANNING



TO CALL IN YOUR CASE IN CHIEF?

**MR. TROCHA:** IT IS. [redacted], WITHOUT GETTING INTO ANY DETAILS OF THE CALL; [redacted]

[redacted], BUT THEN THE CALL JUST ENDED. 30 SECONDS LATER SHE GOT A 911 CALL.

**THE COURT:** ALL RIGHT. MR. ADAIR, YOUR RESPONSE TO THAT?

**MR. ADAIR:** [redacted] OBJECTION, BUT I BELIEVE SHE'S A WITNESS THAT WAS RELATIVELY LATE DISCOVERED OR WHATEVER. I DON'T BELIEVE THERE ARE ANY REPORTS CONCERNING HER STATEMENTS THAT I'VE RECEIVED. [redacted]

**THE COURT:** WELL, WHY DON'T YOU CONSULT WITH MR. TROCHA ON THAT.

DID YOU KNOW THE NAME OF THE WITNESS?

**MR. TROCHA:** I DO. IT'S KENDALL HILDENBRAND. [redacted]

**THE COURT:** ALL RIGHT. [redacted]



0359

**SCE238643 BURTON, ERIC** 7-19-05

Attorney Adair makes a request for the 911 tapes. The people indicate that there was never a request made and the tapes were recorded over. Attorney Adair makes a motion to dismiss based on destruction of evidence that show the defendant's innocence. The motion is **DENIED**.

Attorney Adair makes a discovery motion for production of video from the police car. The motion is **DENIED**.

~~The people make a motion to allow a witness to testify to the fact that the ... called her, the nature of the call and how the call ended. The Court will **RESERVE** on that issue.~~

10:42am The Court takes a brief recess while the defendant is dressed out.

11:18 am Court is again in session with all parties present as previously noted. The defendant is now dressed in civilian clothing.

11:20 am a panel of 42 prospective jurors is present. The prospective jurors are advised that pursuant to CCP209, if they fail to return to this courtroom when so ordered, they will be subject to sanctions in maximum amounts allowable by law. **JURY TRIAL COMMENCES** when the prospective jurors are sworn as to their qualifications to serve. Prospective jurors are seated according to the random list. The Court makes welcoming remarks, introduces the case, counsel, the defendant, and the names of the witnesses. The Court reads the Complaint/Information filed herein. Voir dire begins. Jurors are challenged and excused according to the confidential seating chart.

11:49 am reported sidebar held for 1 minute.

11:50 am Voir dire resumes.

11:57 am The prospective jurors are admonished and excused for the luncheon recess. Out of the presence of the jurors, Court and counsel discuss issues relating to prospective jurors.

12:00 pm Court is in recess.

1:34 pm Court is again in session with all counsel as previously noted, the defendant and all prospective jurors are present. Voir dire resumes.

1:35 pm Juror #5335584 requests to speak to the Court and counsel in private (reported 2 minutes).

1:37 pm Court is again in session and voir dire resumes.

2:54 pm Unreported sidebar held for 1 minute.

2:55 pm The prospective jurors are admonished and excused for the afternoon recess. Out of the presence of the prospective jurors, prospective juror #5213150 addresses the court.



**THE COURT:** ALL RIGHT. BUT OTHERWISE IT WILL

WITH REGARD TO THE OFFICER OR THE DISPATCHER WHO'S GOING TO BE TESTIFYING NEXT. I BELIEVE -- I HAD HEARD MR. TROCHA'S REQUEST. YOU WERE GOING TO RESPOND.

SO MUCH THAT IT'S NOT BEING OFFERED FOR ITS TRUTH, BUT IT'S MORE CONTEMPORANEOUS STATEMENTS THAT --

**MR. ADAIR:** WELL, I WOULD SUBMIT IT'S NOT

**THE COURT:** HIS ACTUAL WORDS AS TO WHAT HAS HAPPENED LIKE, THAT'S PROBABLY HEARSAY.



**THE CLERK:** YOU DO SOLEMNLY STATE THE EVIDENCE YOU SHALL GIVE IN THIS MATTER SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

**KENDALL HILDENBRAND,**

CALLED BY THE PEOPLE, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

**THE WITNESS:** YES, I DO.

**THE CLERK:** THANK YOU. PLEASE BE SEATED IN THE WITNESS STAND.

WILL YOU PLEASE STATE YOUR FULL NAME, SPELLING BOTH YOUR FIRST AND LAST FOR THE RECORD.

**THE WITNESS:** KENDALL, K-E-N-D-A-L-L. LAST NAME HILDENBRAND, H-I-L-D-E-N-B-R-A-N-D.

**THE COURT:** MS. HILDENBRAND, YOUR VOICE IS A LITTLE SOFT. IF YOU COULD LEAN CLOSE TO THE MICROPHONE AND TRY TO SPEAK A LITTLE MORE LOUDLY SO EVERYONE CAN HEAR YOU.

**THE WITNESS:** OKAY.

**THE COURT:** THANK YOU.

**DIRECT EXAMINATION**

**BY MR. TROCHA:**

Q. GOOD AFTERNOON, MS. HILDENBRAND.
A. HELLO.
Q. DO YOU WORK AT THE EL CAJON POLICE DEPARTMENT?
A. I DO.
Q. IN WHAT CAPACITY?
A. I'M A COMMUNICATIONS OPERATOR FOR THE POLICE DEPARTMENT.




Q. DO YOU HOLD A SPECIFIC TITLE OR RANK OR ANYTHING OF THAT NATURE?
A. THAT IS A COMMUNICATIONS OPERATOR.
Q. HOW LONG HAVE YOU BEEN DOING THIS JOB?
A. IT WILL BE TWO YEARS IN AUGUST.
Q. SPECIFICALLY WHAT ARE YOUR DUTIES?
A. I ANSWER ALL CALLS FOR SERVICE, NON-EMERGENCY AND 911 CALLS.
Q. ARE YOU ABLE TO DIFFERENTIATE BETWEEN THE CALLS?
A. YES.
Q. HOW SO?
A. THERE IS A DIFFERENT RING TONE FOR A 911,

Q. WERE YOU ON DUTY BACK OF MARCH 19TH OF LAST YEAR?
A. YES.
Q. AS A COM OPERATOR?
A. YES. AS A COM OPERATOR.




NEED THE CLOTHING IN EVIDENCE.

**MR. ADAIR:** I WAS MORE CONCERNED ABOUT THE CONTENTS OF THE BACKPACK.

**MR. TROCHA:** I WASN'T PLANNING ON INTRODUCING ANY OF THE CONTENTS OF THE BACKPACK. WE WERE GOING TO MENTION THERE WAS A BACKPACK. WE CAN GO INTO THE CONTENTS AT A LATER TIME, BECAUSE I KNOW MR. ADAIR --

**THE COURT:** SO THE ONLY ITEM IS THE CLOTHING RIGHT NOW YOU'RE GOING TO TALK ABOUT, IT IS THE BELT?

**MR. TROCHA:** PRECISELY.

**THE COURT:** OKAY.

**MR. TROCHA:** [redacted]

**THE COURT:** I THINK OVERALL AND BASED UPON THE FACT THE DEFENSE WAS ABLE TO ILLICIT EVIDENCE OF THE VICTIM'S PAST ACTS OF VIOLENCE, PEOPLE ARE ENTITLED TO PUT EVERYTHING IN CONTEXT, [redacted]. I THINK IT'S APPROPRIATE.

**MR. ADAIR:** I GUESS THERE'S AN ISSUE AS TO WHETHER I WOULD BE ABLE TO ILLICIT RELEVANT EVIDENCE AS TO THE ALLEGED VICTIM'S TENDENCIES TO VIOLENCE.

**THE COURT:** I THINK YOU'VE ELICITED AMPLE --

**MR. TROCHA:** HE'S ADMITTED --



I'LL, IN TURN, EXTEND YOU THE SAME COURTESY AND WE'LL MAKE THE LIFE OF OUR COURT REPORTER THAT MUCH EASIER AS WELL.

SO I UNDERSTAND THAT YOU DON'T BELIEVE THAT YOU'RE BEING EFFECTIVELY REPRESENTED BY MR. PLUMMER. I NEED TO KNOW FACTS AND SPECIFICS THAT LEAD YOU TO THAT CONCLUSION.

THE DEFENDANT: NO. 1, I WOULD LIKE THOSE MOTIONS PULLED BECAUSE THEY ARE INSUFFICIENT.

THE COURT: YOU WOULD LIKE THE MOTIONS WHAT?

THE DEFENDANT: PULLED. THE 1538 MOTIONS THAT WERE FILED, INCORRECTLY. THEY WILL BE DEEMED INSUFFICIENT DUE TO THE FACT THAT ITEMS WERE NOT SPECIFICALLY LISTED PERTAINING TO ITEMS THAT WERE SEIZED. I HAVE NOT AS YET AT THIS POINT, AFTER REQUESTING SEVERAL TIMES, TO HAVE RECEIPT OF THE PROPERTY THAT WAS SEIZED FROM ME. MY LIFE, MY PROPERTY HAVE BEEN SEIZED FROM ME UNLAWFULLY. IT WAS NOT MENTIONED IN THE FIRST MOTION THAT WAS SUBMITTED THAT PRIOR TO INTERROGATION THERE WAS ALSO AN ADDITIONAL 4TH AMENDMENT VIOLATION WHEREAS EVIDENCE WAS TAKEN FROM MY BODY. BELT, PANTS, SHIRT, SOCKS, SHOES, AND GLASSES WERE REMOVED FROM MY BODY, TAKEN AND PLACED WITH OTHER PROPERTY THAT WAS SEIZED,



. THAT VIOLATION OF THE 4TH AMENDMENT SHOULD HAVE BEEN MENTIONED IN THE MOTION BECAUSE IT WAS DONE WITHOUT WARRANT, AND ALSO THERE WAS A VIOLATION OF PENAL CODE 147 AS I BELIEVE PRIOR TO INTERROGATION. I WAS STRIPPED NAKED, PUT INTO A WHITE PAPER SUIT, BAREFOOT AND FREEZING AND PLACED IN THE ISOLATION CELL FOR APPROXIMATELY ONE HOUR PRIOR TO INTERROGATION.

THE COURT: YOU WERE UNDER ARREST DURING ALL OF THAT?

THE DEFENDANT: I WAS PLACED IMMEDIATELY UNDER ARREST, YOUR HONOR, FROM THE POINT OF CONTACT WITH THE POLICE.

THE COURT: GO AHEAD.

THE DEFENDANT: THERE WAS STATEMENTS ENTERED ALSO IN THAT FIRST MOTION THAT WERE FALSE STATEMENTS THAT I SPECIFICALLY TOLD MY ATTORNEY, MR. PLUMMER, THAT I DID NOT MAKE. AFTER THE POLICE MADE DIRECT INCRIMINATING STATEMENTS, "WHERE IS --" OR QUESTION AND DIRECT INCRIMINATING QUESTION, ALLEGED I STUCK TO MY RIGHT TO REMAIN SILENT. I SAID NOTHING.

ALLEGED



[redacted], BEFORE INTERROGATION I INVOKED MY 6TH AMENDMENT RIGHT TO COUNSEL IMMEDIATELY FOLLOWED BY MY 5TH AMENDMENT RIGHT TO REMAIN SILENT. MR. PLUMMER DID NOT MENTION THAT IN THE MOTION. HE OMITTED THAT, [redacted] AFTER I INVOKE MY 5TH AMENDMENT RIGHT AND THE OFFICER INITIATED THE CONVERSATION. I DID NOT. I THEN AGAIN WAS QUESTIONED. [redacted] A ROLE IN DENYING MY 1ST AMENDMENT RIGHT TO FREEDOM OF SPEECH AND EXPRESSION IN VIOLATION OF PENAL CODE 851(D). I WAS DETAINED PAST THREE HOURS.

UPON MY IMMEDIATE REQUEST TO SPEAK TO MY ATTORNEY, I SHOULD HAVE BEEN ALLOWED TO CALL MY ATTORNEY, [redacted]

LIKE A SLAVE, SHACKLED AND BAREFOOT. PHOTOGRAPHS WERE TAKEN

SINCE I

AM BASICALLY A LAYMAN IN THIS FIELD,

FILED 0067
Clerk of the Superior Court

OCT 2 0 2004

By: M. Rapello, Deputy

Lee Plummer
Attorney at Law
State Bar # 77783
4045 Bonita Rd. #202
Bonita, Ca. 91902

Telephone number (619) 267-1710

Attorney for Eric Wilton Burton

SUPERIOR COURT OF CALIFORNIA

COURT OF THE EAST COUNTY DIVISION

COUNTY OF SAN DIEGO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, | Dept. |
| | No. SCE238643 |
| vs. | NOTICE OF MOTION AND MOTION TO SUPPRESS EVIDENCE(PENAL CODE 1538.5 |
| ERIC WILTON BURTON Defendant. | DATE: November 5, 2004<br>TIME: 9:30 A.M.<br>ESTIMATED TIME : ½ HOUR |

TO THE ABOVE-ENTITLED COURT AND TO MARIA HANNAH, DEPUTY DISTRICT ATTORNEY, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA

PLEASE TAKE NOTICE that on November 5, 2004, in Department 11 at 9:30 A.M. , or as soon thereafter as the matter may be heard, the defendant, ERIC WILTON BURTON, will move that the Court suppress all evidence under Penal Code 1538.5 seized by the El Cajon Police Department from the defendant's home at the time of the defendants arrest. The search was in defendant's home without a warrant.

The evidence that defendant seeks to suppress includes, but is not limited to, the following indicated items:

All physical (and intangible) evidence seized or obtained as a result of this search will be challenged based on search and seizure violations that occurred during:

__x_ Defendant's detention;

__x_ Defendant's arrest.

The physical (and intangible) evidence seized or obtained from this search occurred at the following place(s), including:

_x__ The residence, building, structure, or premises entered or invaded by the police in this cause;

_x__ The box(es), package(s), or other containers opened or invaded by the police in this cause;

This motion challenges all physical (and intangible) evidence seized or obtained as a result of the deprivation of the liberty or right to privacy of the following person: Eric Burton

The complained of search and seizure violates defendant's Fourth Amendment rights under the United States Constitution.

More specifically, this motion is based on violation of defendant's reasonable expectation of



privacy, as guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and on the following particular grounds:

_x__ The police action was without a warrant, and lacked sufficient cause to justify the invasion of liberty complained of;

_x__ The arrest ~~was in~~ outside defendant's place of residence without a warrant;

This motion will be based on the following evidence:

__x_ Evidence to be presented at the hearing on this motion;

__x_ Supporting declarations (attached to this motion);

__x_ Transcript of preliminary hearing:

__x_ Memorandum of points and authorities (attached to this motion);

Date: 10-19-04

Respectfully submitted,

Lee Plummer

Attorney at Law



0102

CHARLES H. ADAIR
ATTORNEY AT LAW
533 F STREET, STE. 212
SAN DIEGO, CA 92101
619/233-3161
STATE BAR NUMBER: 52163

MAR 16 2005

ATTORNEY FOR DEFENDANT

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

EAST COUNTY DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | CASE NO: SCE238643 |
| | D.A. NO: MAJ339 |
| Plaintiff, | |
| vs. | NOTICE OF MOTION TO SUPPRESS DEFENDANT'S ALLEGED ORAL ADMISSIONS OR CONFESSIONS |
| ERIC W. BURTON, | |
| Defendant | DATE: 3/16/05 |
| | TIME: 9:00 AM |
| | PLACE: S-11 |

TO: THE DISTRICT ATTORNEY OF SAN DIEGO COUNTY

PLEASE TAKE NOTICE that at the time and place noted above, the defendant will move for an order suppressing all evidence of the defendant's alleged admissions or confession to the charges in the above-entitled action.

This motion will be made on the ground that the introduction of such evidence before the trier of fact would violate the defendant's right to counsel under both the Fifth and the Sixth Amendment,



and his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the Untied States Constitution.

This motion will be based on this notice of motion, and memorandum of points and authorities served and filed herewith, on such supplemental memoranda of points and authorities as may hereafter be filed with the court or stated orally at the conclusion of the hearing on the motion, on all the papers and records on file in this action, and on such oral and documentary evidence as may be presented at the hearing of the motion.

Dated: 3/15/05

CHARLES H. ADAIR,
Attorney for Defendant



CALL OFFICER HOLMES.

(THE WITNESS WAS DULY SWORN)

THE CLERK: THANK YOU. PLEASE BE SEATED IN THE WITNESS BOX.

SIR, PLEASE STATE YOUR FIRST NAME AND LAST NAME, SPELLING OF BOTH, PLEASE.

THE WITNESS: DONALD HOLMES. D-O-N-A-L-D H-O-L-M-E-S.

THE CLERK: THANK YOU.

DONALD HOLMES

CALLED AS A WITNESS ON BEHALF OF THE PROSECUTION, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MS. HANNAH:

Q. OFFICER HOLMES, WHERE ARE YOU EMPLOYED?

A. POLICE OFFICER WITH THE CITY OF EL CAJON.

Q. HOW LONG HAVE YOU BEEN SO EMPLOYED?

A. THREE YEARS.

Q. WERE YOU WORKING ON MARCH 19TH OF THE YEAR 2004?

A. I WAS.

Q. DO YOU RECALL WHAT SHIFT YOU WERE WORKING?

A. DAY SHIFT, PATROL.

Q. DID YOU RECEIVE A DISPATCH CALL OR RESPOND TO DISPATCH CALL TO REPORT TO 425 EAST MAIN STREET?

A. I DID.

Q. DID YOU, IN FACT, RESPOND TO THAT ADDRESS?

A. YES.

Q. DO YOU RECALL APPROXIMATELY WHAT TIME YOU RESPONDED TO THAT LOCATION?

A. I DON'T RECALL THE TIME OFFHAND. I KNOW IT WAS THE AFTERNOON.

[redacted]

Q. DO YOU SEE THAT PERSON IN THE COURTROOM TODAY?

A. YES, I DO.

Q. WILL YOU POINT THAT PERSON OUT AS TO WHERE THEY'RE SEATED AND SOMETHING THEY'RE WEARING?

A. THE SUBJECT SITTING AT THE DEFENSE TABLE WITH THE SUNGLASSES.

THE COURT: INDICATING AND IDENTIFYING THE DEFENDANT, MR. ERIC BURTON.

MS. HANNAH: THANK YOU, YOUR HONOR.

///



BY MS. HANNAH:

Q. OFFICER HOLMES, WHEN YOU ARRIVED AT THAT LOCATION, WERE YOU ALONE OR WITH A PARTNER?

A. I WAS ALONE AT THAT TIME.

Q. WHEN YOU ARRIVED WERE THERE OTHER POLICE OFFICERS ARRIVING AT THE SAME TIME OR WERE YOU THE FIRST TO ARRIVE?

A. I WAS THE FIRST, ~~BUT THERE WERE SEVERAL THAT WERE COMING THAT WAY~~.

Q. WHEN YOU ARRIVED AT 425 EAST MAIN STREET, DID YOU IMMEDIATELY SEE THE DEFENDANT?

A. YES.

Q. COULD YOU DESCRIBE TO US WHERE HE WAS AND WHAT HE WAS DOING?

A. HE WAS -- ~~IN ORDER TO GET TO THE APARTMENT~~ COMPLEX, ~~YOU HAVE TO DRIVE THROUGH A DRIVEWAY IN BETWEEN TWO BUSINESSES, AND IT OPENS UP INTO A PARKING LOT~~. HE WAS STANDING DIRECTLY -- IF YOU DROVE STRAIGHT DOWN THE DRIVEWAY, DIRECTLY OUT IN FRONT OF ONE OF THE APARTMENTS [redacted]

Q. WAS HE INSIDE A VEHICLE OR OUTSIDE A VEHICLE?

A. NO, HE WAS OUTSIDE, [redacted]

Q. DID YOU NOTICE HOW CLOSE HE WAS OR WHETHER OR NOT HE WAS STANDING CLOSE TO A VEHICLE?

A. [redacted] -- THERE WERE VEHICLES IN THE PARKING LOT, BUT I WASN'T REALLY, AT THAT POINT IN TIME, PAYING ATTENTION TO ANY VEHICLES IN PARTICULAR.

43



Q. WHEN YOU SAW THE DEFENDANT, WHAT DID YOU DO?

A. I CONDUCTED WHAT WE WOULD CALL A PEDESTRIAN HOT STOP.

Q. CAN YOU PLEASE DESCRIBE FOR THE COURT WHAT THAT IS?

A. BASICALLY, JUST GIVING HIM DIRECTION AT GUNPOINT. [redacted]

Q. WHEN YOU DID THIS, HAD OTHER OFFICERS ARRIVED AT THE SCENE?

A. YES.

[redacted]

Q. WHEN YOU GAVE THESE INSTRUCTIONS, DID THE DEFENDANT RESPOND?

A. YES.

[redacted]

MR. ADAIR: YOUR HONOR, COULD I INTERRUPT BRIEFLY? I'VE GOT A LOT GOING ON. I'D ASK IF THE WITNESS IS BEING EXCUSED FROM THE COURTROOM.

THE COURT: ALL RIGHT. THE MOTION TO EXCLUDE IS GRANTED.

OTHER THAN POSSIBLY YOUR CLIENT, DO YOU HAVE ANY OTHER WITNESSES YOURSELF?

MR. ADAIR: NO, YOUR HONOR.

THE COURT: ALL RIGHT. THE OFFICERS IN THE BACK



OF THE COURTROOM WILL PLEASE STEP OUTSIDE, NOT DISCUSS THE SUBJECT MATTER WITH ANYONE UNTIL THE CONCLUSION OF THIS HEARING. THANK YOU.

MS. HANNAH: THANK YOU, YOUR HONOR.

BY MS. HANNAH:

Q. WHAT INSTRUCTIONS DID YOU GIVE HIM?

FROM ME. HAD HIM KNEELING DOWN, PUT HIS HANDS BEHIND HIS HEAD AND SPREAD HIS KNEES ACROSS HIS ANKLES SO THAT HE WAS IN A POSITION WHERE HE COULDN'T EASILY MOVE.

Q. AT SOME POINT DID YOU PLACE THE DEFENDANT INTO HANDCUFFS?

A. I DID NOT, BUT HE WAS PLACED INTO HANDCUFFS.

Q. DID YOU OBSERVE THAT HAPPENING?

A. YES.



Q. HOW LONG AFTER YOU ARRIVED DID YOU ESTIMATE THAT YOU PLACED THE DEFENDANT INTO CUSTODY?

A. AS FAR AS PUTTING HIM INTO HANDCUFFS?

Q. YES.

A. PROBABLY WITHIN 10, 15 SECONDS.

Q. DID YOU OBSERVE ANY OTHER PERSONS AROUND THE DEFENDANT'S LOCATION EITHER BEFORE OR AFTER THE DEFENDANT WAS PLACED INTO HANDCUFFS?

A. YES.

Q. WHO DID YOU NOTICE?

A. THERE WAS A SUBJECT WHO HAD LATER BEEN

Q. WHAT HAPPENED TO THAT SECOND INDIVIDUAL?

A. I TOLD HIM TO REMAIN WHERE HE WAS WHILE I WAS GIVING MR. BURTON DIRECTIONS, AND HE STOOD BY WITH HIS HANDS IN THE AIR WHILE WE SECURED MR. BURTON IN HANDCUFFS.

Q. AFTER MR. BURTON WAS PLACED INTO HANDCUFFS, DID AN AGENT OR OFFICER KIRK ARRIVE?

A. YES.





Q. CAN YOU TELL US WHAT YOU OBSERVED OR HEARD?

A. AS I WAS WALKING MR. BURTON TO THE PATROL CAR, AGENT KIRK ASKED HIM WHERE THE ALLEGED WEAPON WAS OR THE ALLEGED GUN WAS. I

Q. DID YOU HEAR AGENT KIRK ASK THE DEFENDANT IF HE COULD SEARCH THE RESIDENCE?

A. I DID NOT.

Q. WERE YOU THE OFFICER THAT TRASPORTED THE DEFENDANT TO EL CAJON POLICE STATION?

A. YES.

Q. WHEN DID THAT OCCUR?

A. WITHIN A FEW MINUTES OF PLACING HIM UNDER ARREST, I THINK I GOT SOME INFORMATION FROM THE OTHER SUBJECT WHO WAS THERE WITH HIM,

Q. WHEN YOU TRANSPORTED THE DEFENDANT TO THE POLICE



STATION, DID YOU PROCESS THE DEFENDANT?

A. YES.

Q. AT SOME POINT DID YOU INDICATE TO THE DEFENDANT THAT ANOTHER OFFICER WOULD THEN COME IN AND SPEAK WITH HIM?

A. I DID.

OFFICER HOLMES, AT THE POLICE STATION YOU INDICATED THAT YOU TOLD THE DEFENDANT ANOTHER OFFICER WOULD SPEAK TO HIM; IS THAT CORRECT?

A. YES.

~~Q. AND DO YOU RECALL WHETHER OR NOT THE DEFENDANT SAID ANYTHING TO YOU AFTER YOU TOLD HIM ANOTHER OFFICER WOULD BE INTERVIEWING OR SPEAKING WITH HIM?~~

~~A. I DON'T RECALL OFFHAND. I COULD REFRESH MY MEMORY BY LOOKING AT MY REPORT TO GIVE YOU THE ANSWER.~~

~~Q. IF THAT WILL REFRESH YOUR MEMORY, PLEASE DO.~~

~~A. OKAY.~~

Q. UPON INFORMING THE DEFENDANT THAT ANOTHER OFFICER WOULD BE IN TO SPEAK WITH HIM, DID THE DEFENDANT HAVE A RESPONSE?

A. YES, HE DID.

Q. DO YOU REMEMBER WHAT HIS REPLY WAS?

A. HE TOLD ME THAT HE WOULD LIKE TO SPEAK TO AN ATTORNEY AND EXERCISE HIS 5TH AMENDMENT RIGHT;

Q. DID HE USE THAT LANGUAGE SPECIFICALLY "CONCERNING MY 5TH AMENDMENT RIGHTS"?



A. YES, HE DID.

MS. HANNAH: THANK YOU. NOTHING FURTHER.

THE COURT: MR. ADAIR.

MR. ADAIR: THANK YOU, YOUR HONOR.

CROSS-EXAMINATION

BY MR. ADAIR:

Q. OFFICER HOLMES, GOOD MORNING.

A. GOOD MORNING.

Q. OFFICER, YOU ARRIVED AT THE LOCATION WHERE MR. BURTON WAS; CORRECT?

A. CORRECT.

Q. I TAKE IT YOU WERE THE FIRST OFFICER OUT OR ON THAT SCENE; CORRECT?

A. YES.

Q. YOU HAD YOUR GUN OUT?

A. [illegible], YES.

Q. MR. BURTON WAS THERE WITH HIS HANDS UP AT SOME POINT?

A. CORRECT.

Q. WAS IT THAT POINT WHERE THE OTHER OFFICERS STARTED TO ARRIVE?

A. CORRECT, AND THE PROCESS I DIDN'T EXACTLY SEE BECAUSE I WAS FOCUSED ON HIM, BUT THEY WERE ARRIVING DURING THAT PROCESS, YES.

Q. YOU SAID THAT YOU DIDN'T HANDCUFF HIM BUT SOMEBODY ELSE DID?

A. CORRECT.



Q. AND DID YOU STILL HAVE YOUR GUN OUT COVERING MR. BURTON AT THAT TIME?

A. YES.

[redacted].

Q. WHOSE RESPONSIBILITY WAS MR. BURTON AT THAT TIME?

A. I WOULD SAY MINE.

Q. AND DID YOU STAY WITH MR. BURTON TO MAKE SURE THAT HE DIDN'T DO ANYTHING THAT WOULD BE DANGEROUS TO THE OFFICERS OR ANYBODY ELSE?

A. I GUESS I'M NOT UNDERSTANDING YOUR QUESTION.

Q. ALL RIGHT. PUT IT SIMPLY, YOU WERE STILL WATCHING MR. BURTON VERY CLOSELY; [redacted]

A. [redacted] -- I MEAN, THERE WERE TWO OTHER OFFICERS ON THE SCENE, SO IT WASN'T THAT I WAS DIRECTLY STANDING THERE WATCHING HIM FOR 100 PERCENT OF THE TIME. THERE WERE OTHER THINGS THAT WERE GOING ON AT THAT TIME. ONCE HE WAS SECURED, [redacted]

Q. DID YOU PUT MR. BURTON IN YOUR PATROL VEHICLE?

A. YES.

~~Q. HOW SOON AFTER HE WAS HANDCUFFED? COULD YOU GIVE ME THE TIME PERIOD BETWEEN THE TIME HE WAS HANDCUFFED AND THE TIME HE WENT IN YOUR VEHICLE.~~

~~A. I CAN'T GIVE YOU AN EXACT TIME FRAME,~~ [redacted]

Q. WHEN HE WAS IN YOUR PATROL CAR, WERE YOU THERE WITH HIM?

A. THE ENTIRE TIRE HE WAS IN PATROL CAR?

Q. YES.

A. I DON'T RECALL.

Q. WERE THE WINDOWS DOWN IN YOUR PATROL CAR?

A. [redacted], BUT I CAN'T SPECIFICALLY RECALL THAT DAY.

Q. AND I BELIEVE YOU TESTIFIED THAT YOU'VE WALKED MR. BURTON TO THE PATROL VEHICLE; CORRECT?

A. CORRECT.

Q. WHEN DID YOU WRITE YOUR REPORT ON THIS INCIDENT?

A. I WOULD HAVE WRITTEN IT THAT AFTERNOON.

Q. BUT WITHIN WHAT, A COUPLE OF HOURS AFTER THE EVENTS TOOK PLACE?

A. CORRECT.

Q. AND I BELIEVE YOU TESTIFIED TO THE FACT THAT YOU NEVER HEARD OR DID YOU EVER HEAR AGENT KIRK TALKING TO MR. BURTON?

A. YES, I DID.

Q. WHAT WAS SAID?

A. THE PORTION THAT I HEARD WAS HIM ASKING MR. BURTON WHERE THE ALLEGED WEAPON WAS.



FEBRUARY 24TH, 2005, 8:30 A.M., EL CAJON, CA., DEPT. 12

THE COURT: LADIES AND GENTLEMEN, GOOD MORNING. WE'RE ON THE RECORD IN THE CASE OF THE PEOPLE VERSUS ERIC BURTON, CASE SCE 238643. MR. BURTON IS BEFORE THE COURT, TOGETHER WITH HIS ATTORNEY OF RECORD, MR. ADAIR. MISS HANNAH IS AGAIN PRESENT FOR THE PEOPLE. I SAY AGAIN, BECAUSE THIS HEARING IS A CONTINUATION, A RESUMPTION OF PRIOR HEARINGS CONCERNING THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE PURSUANT TO PENAL CODE SECTION 1538.5. THE FIRST PORTION OF A HEARING WAS CONDUCTED ON JANUARY 28TH. FURTHER HEARING WAS HAD CONCERNING THE SAME MOTION ON JANUARY 31ST. ON THAT DATE THE COURT GRANTED THE DEFENSE MOTION AND REQUEST TO SET A FURTHER HEARING DATE SO AS TO PERMIT ONE OR TWO PROSPECTIVE WITNESSES TO BE SUBPOENAED OR RE-SUBPOENAED AND BROUGHT BEFORE THE COURT TO TESTIFY. SO THAT BRINGS US TO TODAY'S DATE, PLACE AND TIME.

MR. ADAIR, ARE YOU READY TO PROCEED?

MR. ADAIR: WE ARE, YOUR HONOR. AT THIS TIME I'D LIKE TO CALL MR. HELSEL TO THE STAND TO TESTIFY.

THE COURT: VERY WELL.

(THE WITNESS WAS DULY SWORN)

THE CLERK: THANK YOU. PLEASE BE SEATED IN THE WITNESS BOX. SIR, PLEASE STATE YOUR FULL NAME FOR THE RECORD, SPELLING YOUR FIRST AND LAST NAME.

THE WITNESS: JON, J-O-N, SCOTT, H-E-L-S-E-L.

THE COURT: MR. HELSEL, KEEP THAT MICROPHONE RIGHT IN FRONT OF YOU. SPEAK RIGHT INTO IT AND KEEP YOUR



VOICE UP, PLEASE.

MR. ADAIR, YOU MAY PROCEED.

MR. ADAIR: THANK YOU, YOUR HONOR.

JON SCOTT HELSEL

CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. ADAIR:

Q. MR. HELSEL, DO YOU KNOW ERIC BURTON?

A. YES, I DO.

Q. COULD YOU POINT HIM OUT AND IDENTIFY HIM, PLEASE?

A. SITTING RIGHT NEXT TO YOU.

THE COURT: INDICATING AND IDENTIFYING MR. BURTON.

A. YES, ERIC BURTON.

BY MR. ADAIR:

Q. MR. HELSEL, COULD YOU INDICATE IN WHAT CONTEXT YOU KNOW MR. BURTON? IN OTHER WORDS, DO YOU LIVE --

A. I'M A PROPERTY MANAGER FOR QUINN PROPERTY MANAGEMENT COMPANY IN SAN DIEGO, AND HE RENTED A PROPERTY FROM US OUT IN EL CAJON, 425 EAST MAIN, APARTMENT 5.

Q. WERE YOU PRESENT LAST YEAR AT A TIME WHEN HE WAS ARRESTED?

A. YES.



Q. COULD YOU EXPLAIN TO US WHAT YOU SAW OR HEARD? WHAT WAS THE FIRST THING THAT YOU NOTICED THAT SEEMED UNUSUAL.

MS. HANNAH: OBJECTION. LEADING.

THE COURT: OVERRULED. YOU CAN ANSWER. JUST TELL US WHAT HAPPENED, WHAT YOU SAW.

THE COURT: WHERE IS THIS IN RELATION TO YOUR APARTMENT?

THE WITNESS: I'M IN 6.

THE COURT: ALL RIGHT. GO AHEAD, MR. ADAIR.

BY MR. ADAIR:

Q. COULD YOU TELL US HOW MANY UNITS ARE IN THAT?

A. THERE'S SIX.



Q. HOW FAR AWAY FROM YOU WAS HE AT THE TIME THAT THE OFFICERS ARRESTED HIM?

A. HE WAS RIGHT IN FRONT OF ME AT FIRST. THEN THEY MADE HIM STEP OUT, LAY DOWN ON THE BLACKTOP, PUT HIS HANDS BEHIND HIM.

Q. HOW FAR WAS HE AWAY FROM YOU AT THE TIME HE WAS LAID DOWN ON THE BLACKTOP?

A. TEN FEET.



[redacted]

Q. WERE YOU STILL WATCHING AT THAT POINT?

A. PRETTY MUCH SO, YES.

Q. COULD YOU TELL US THE NEXT THING THAT YOU SAW OR HEARD?

A. THE YOUNG MAN KEPT OPENING THE DOOR IN APARTMENT 5, AND THE ATTENTION WAS DRAWN. THE OFFICER SAW THAT, SO HE WENT OVER THERE AND KNOCKED ON THE DOOR BECAUSE THE KID CLOSED THE DOOR AS HE CAME UP. HE OPENED THE DOOR, AND I GUESS THEY WANTED ACCESS AND THE KID WOULDN'T LET HIM -- OR [redacted]

Q. LET ME INTERRUPT FOR A SECOND AND ASK YOU HOW FAR AWAY FROM YOU WAS THE POLICE CAR THAT MR. BURTON --

A. THE POLICE CAR WAS 20 FEET PLUS, MAYBE 25. I [redacted]

Q. WAS THE NEXT THING THAT HAPPENED?

A. I'M NOT SURE WHETHER THE OFFICERS CHANGED OR THE OFFICER. IT'S BEEN A WHILE. ANYHOW, ONE OF THE OFFICERS WENT INTO THE UNIT, BROUGHT THE KID OUTSIDE, AND THEY HAD SOMETHING WITH HIM. [redacted], BUT I DIDN'T SEE IT BECAUSE IT WAS WRAPPED.

Q. WERE THEY CARRYING SOMETHING THAT WAS WRAPPED?

A. SOMETHING, YES.



Q. DID YOU HEAR ANY PART OF THE CONVERSATION BETWEEN MR. BURTON AND THE POLICE OFFICERS AFTER HE WAS PUT INTO -- MR. MR. BURTON WAS PUT INTO THE POLICE CAR?

A. NO. ONCE HE WAS IN THE CAR, HE WAS TOO FAR AWAY FROM ME. I KNOW BETTER THAN TO APPROACH THE CAR WHEN SOMEBODY IS IN CUSTODY. STAY OUT OF IT.

MR. ADAIR: COULD I HAVE A MOMENT, YOUR HONOR?

THE COURT: SURE.

BY MR. ADAIR:

Q. MR. HOW HOLD, COULD YOU DESCRIBE TO THE COURT THE APARTMENT COMPLEX THAT YOU WERE THE MANAGER OF, THE ONE THAT WE HAVE BEEN TALKING ABOUT?



A. THERE'S SIX UNITS IN AN 'L' PATTERN. FIRST THERE'S A ONE BEDROOM, AND THEN THERE'S A STUDIO AND THEN THERE'S A LAUNDRY FACILITY AND THEN THERE'S A GARAGE AND THEN THERE'S ANOTHER TWO STUDIOS. AND HIS WAS IN THE CORNER

Q. HOW FAR AWAY FROM YOUR UNIT WAS HIS UNIT?

A. 25 FEET MORE.

Q. WHEN MR. BURTON WAS ARRESTED BY THE POLICE, WAS HE IN THE PARKING LOT AREA?

A. HE WAS STANDING RIGHT IN FRONT OF MY UNIT. HE WAS TALKING TO ME WHEN THEY DROVE UP.

Q. SO THERE'S NO GARDEN OR ANYTHING LIKE THAT.

A. THEY HAVE PLANTS AND SHRUBBERY OUT IN FRONT OF EACH UNIT.

Q. HOW ABOUT HOW FAR FROM THE UNITS?

A. WELL, IT'S LOW BELOW THE WINDOW. THE FLOWERS



ARE BELOW THE WINDOW.

Q. THE PARKING LOT IS SHARED WITH THE GRAND BAR?

A. NO. THE GRAND HAS THEIR SIDE. I HAD DESIGNATED FOR TENANTS OVER THERE. [redacted] THE PEOPLE IN THE BAR KNEW BECAUSE I WOULD TELL ALEX AND JASON, WHO WERE THE OWNERS OF THE BUSINESS.

MR. ADAIR: MAY I HAVE ONE MOMENT, YOUR HONOR.

[redacted] WHEN THE POLICE ARRESTED HIM?

A. HE WAS STANDING IN FRONT OF MY UNIT, NO. 6.

[redacted]

Q. YEAH.

A. HE WAS STANDING RIGHT THERE.

[redacted]

MR. ADAIR: COULD I HAVE A MOMENT, YOUR HONOR? NO FURTHER QUESTIONS, YOUR HONOR. THANK YOU.

THE COURT: ALL RIGHT. MISS HANNAH, CROSS-EXAMINATION.

MS. HANNAH: THANK YOU, YOUR HONOR.

CROSS-EXAMINATION

BY MS. HANNAH:

Q. MR. HELSEL?

A. YES.





Q. DID YOU SEE MR. BURTON MAKE A PHONE CALL?

A. . I DON'T REMEMBER. .

Q. WHEN THE POLICE ARRIVED --

A. WE WERE TALKING AND WE WERE EXCHANGING SOME DIALOGUE. ALL OF A SUDDEN THERE THEY WERE.

Q. WHEN THE POLICE ARRIVED, DID THEY CONTACT THE DEFENDANT?

A. OH, YES.

Q. AND DID YOU OBSERVE THIS OCCURRING?

A. YES, RIGHT IN FRONT OF ME.



MS. HANNAH: THANK YOU. NOTHING FURTHER.

THE COURT: MR. ADAIR, DO YOU HAVE ANY FURTHER QUESTIONS?

MR. ADAIR: BRIEFLY, YOUR HONOR.

REDIRECT EXAMINATION

BY MR. ADAIR:

Q. MR. HELSEL, WHEN THE POLICE ARRIVED, DID THEY HAVE THEIR GUNS OUT?

A. YES.

Q. AND THEY HAD THEIR GUNS OUT UNTIL MR. BURTON WAS HANDCUFFED?

A. YES.

MR. ADAIR: THANK YOU VERY MUCH.

THE COURT: THIS ALL HAPPENED PRETTY QUICKLY ONCE THE POLICE ARRIVED ON THE SCENE?

A. PRETTY QUICK.

Q. THEY TOOK HIM DOWN AT GUNPOINT, THEY PRONED HIM OUT ON THE GROUND?

A. YES, BUT HE WASN'T FIGHTING OR ANYTHING.

THE COURT: UNDERSTOOD.

Q. HOW LONG WOULD YOU ESTIMATE HE WAS ON THE GROUND BEFORE THEY ESCORTED HIM TO ONE OF THE PATROL CARS?

A. [redacted] 15, 20 SECONDS, 30 SECONDS.





Q. DO YOU RECALL ANY CONVERSATION -- HEARING ANY CONVERSATION ABOUT SEARCHING MR. BURTON'S APARTMENT OR HIS VEHICLE OR BOTH?

A. NO, I DIDN'T HEAR ANYTHING.

THE COURT: COUNSEL, ANYTHING FURTHER BASED UPON THE COURT'S INQUIRIES?

MR. ADAIR: NO, YOUR HONOR.

THE COURT: MISS HANNAH?

MS. HANNAH: NO.

THE COURT: ALL RIGHT. MR. HELSEL, THANK YOU VERY MUCH FOR BEING WITH US. YOU MAY STEP DOWN. YOU'RE FREE TO GO.

THE WITNESS: THANK YOU.

THE COURT: MR. ADAIR, DO YOU HAVE FURTHER EVIDENCE TO PRESENT?

MR. ADAIR: NO, YOUR HONOR. COULD I HAVE JUST A



HELP YOU GOD?

**OFFICER DON HOLMES,**

CALLED BY THE PEOPLE, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

**THE WITNESS:** I DO.

**THE CLERK:** THANK YOU. PLEASE BE SEATED. WILL YOU PLEASE STATE YOUR FULL NAME SPELLING BOTH YOUR FIRST AND LAST FOR THE RECORD.

**THE WITNESS:** DON HOLMES. D-O-N, H-O-L-M-E-S.

**THE CLERK:** THANK YOU.

**DIRECT EXAMINATION**

**BY MR. TROCHA:**

Q. GOOD MORNING, OFFICER HOLMES.

A. GOOD MORNING.

Q. YOU'RE ALSO AN OFFICER WITH THE EL CAJON POLICE DEPARTMENT?

A. YES, SIR.

Q. HOW LONG HAVE YOU BEEN WITH EL CAJON?

A. 3 1/2 YEARS.

Q. HAVE YOU BEEN WITH ANY OTHER AGENCIES?

A. NO.

Q. IN YOUR 3 1/2 YEARS EXPERIENCE WITH EL CAJON, HAVE YOU RECEIVED TRAINING IN THE AREA OF EVIDENCE COLLECTION?

A. YES, I HAVE.

Q. WHAT DOES THAT TRAINING CONSIST OF?

A. PROPER EVIDENCE COLLECTION PROCEDURES. DEPARTMENT POLICY RELATING TO HOW WE COLLECT DIFFERENT



TYPES OF EVIDENCE AND THEN ACADEMY TRAINING.

Q. WOULD THIS TYPE OF EVIDENCE COLLECTION TRAINING REFER TO TAKING INTO CUSTODY SUSPECTS' CLOTHES?

A. YES.

Q. AND HOW WOULD YOU GO ABOUT DOING SOMETHING LIKE THAT?

A.

THEN WE WOULD HAVE THE PERSON REMOVE EACH ITEM OF CLOTHING SEPARATELY, . AND AFTER ALL THE CLOTHING IS COLLECTED, WE ISSUE THEM A PAPER SUIT, WHICH THEY WOULD THEN WEAR. .

Q. IS THIS A STANDARD PROCEDURE IN EVERY TYPE OF CASE?

A. , NO.





Q. YOU ALSO RECEIVED TRAINING, I GUESS, IN PHOTOGRAPHY AND PHOTOGRAPHING VEHICLES, EVIDENCE, AND THOSE TYPES OF THINGS?

A. CORRECT.

Q. WHAT'S THE PURPOSE OF THAT TRAINING?

A. THE PURPOSE? SO WE'RE FAMILIARIZED WITH THE CAMERA EQUIPMENT AND JUST GENERAL UNDERSTANDING OF WHAT PHOTOS WE ARE TO TAKE.

Q. ARE YOU TAUGHT TO PHOTOGRAPH CERTAIN THINGS OTHER THAN OTHERS?

A. DEPENDING ON WHAT TYPE OF SITUATION IT IS,

Q. IN ESSENCE, DO YOU TRY TO CAPTURE THE SUBJECTS YOU'RE PHOTOGRAPHING OR WHATEVER YOU'RE PHOTOGRAPHING IN ITS MOST ACCURATE LIGHT?

A. I WOULD SAY THAT'S FAIR TO SAY.

Q. WERE YOU ON DUTY BACK ON MARCH 19TH OF LAST YEAR?

A. YES, I WAS.

Q. DID YOU RECEIVE A CALL TO REPORT TO AN ADDRESS ON 425 EAST MAIN STREET?

A. YES, I DID.

Q. AND THIS IS WITHIN EL CAJON?

A. CORRECT.

Q. AND THAT'S, OF COURSE, WITHIN THE COUNTY OF SAN DIEGO?

A. YES.



BY MR. TROCHA:

Q. WERE YOU ABLE TO ASSOCIATE -- WHAT TYPE OF STRUCTURES, IF ANY, ARE AT THIS ADDRESS?

A. IT'S AN APARTMENT BUILDING.

Q. WERE THERE ANY VEHICLES IN THE PARKING LOT?

A. YES, THERE WERE.

Q. WERE YOU ABLE TO IDENTIFY ONE THAT BELONGED TO MR. BURTON?

A. YES, I DID.

Q. AND WHAT TYPE OF VEHICLE WAS THAT?

A. [redacted]. THE MODEL ESCAPES ME AT THIS POINT IN TIME.

Q. WERE THERE ANY ITEMS IN OR AROUND THE VEHICLE THAT YOU ALSO LATER SEIZED?

A. YES.

Q. WHAT WERE THOSE ITEMS?

A. THERE WAS PAPERWORK ON TOP OF A BLACK BACKPACK, [redacted] [redacted], AND I COLLECTED THAT.



Q. [redacted], DID YOU PLACE MR. BURTON UNDER ARREST?

A. I DID.

Q. WAS HE TRANSPORTED TO THE EL CAJON POLICE DEPARTMENT THEN?

A. YES.

Q. AT THE EL CAJON POLICE DEPARTMENT, DID YOU HAVE THE OPPORTUNITY TO SEIZE AND IMPOUND HIS CLOTHING?

A. YES, I DID.

SPECIFIC KINDS OF CLOTHING.

Q. IF IT WOULD HELP YOU REFRESH YOUR RECOLLECTION.

A. YES, IT WOULD.



MR. PLUMBER'S IN LIMINE MOTION FOR THE FRUIT-OF-THE-POISONOUS-TREE BASED ON THE MIRANDA VIOLATION THAT HAPPENED PRIOR TO THE 4TH AMENDMENT VIOLATION OF THE UNLAWFUL ENTRY, UNLAWFUL SEARCH AND SEIZURE,

I'D LIKE TO CITE CASE PEOPLE VERSUS TURNER, 1984 --

**THE COURT:** YOU'RE RELATING NOW --

**THE DEFENDANT:** . I'M TALKING ABOUT MIRANDA VIOLATION, WHEREAS I WAS ARRESTED --

**THE COURT:** WE'VE ALREADY RULED THAT YOUR STATEMENTS AREN'T COMING IN.

**THE DEFENDANT:** FRUIT-OF-THE-POISONOUS-TREE MOTION WHERE PROSECUTION CANNOT BENEFIT INDIRECTLY OR DIRECTLY FROM THE MIRANDA VIOLATION, WHICH HAPPENED PRIOR TO THE UNLAWFUL ENTRY.

**THE COURT:** LET ME STOP YOU RIGHT THERE. I KNOW THE GROUNDS OF THE MOTION. ATTORNEY WAS INCOMPETENT OR NOT PROPERLY REPRESENTING YOU?

**THE DEFENDANT:** YES.

**THE COURT:** ALL RIGHT. MOST OF THE COMPLAINTS YOU HAVE RAISED RELATE TO ISSUES THAT AROSE BEFORE TRIAL.



Q. DID MR. BURTON SAY ANYTHING ELSE?
A. NOT THAT I HEARD.
MR. ADAIR: THANK YOU. I HAVE NO FURTHER QUESTIONS.
THE COURT: MISS HANNAH, ANY REDIRECT?
MS. HANNAH: NO, YOUR HONOR.
THE COURT: ALL RIGHT. THANK YOU, OFFICER. YOU MAY STEP DOWN.
MISS HANNAH, YOUR NEXT WITNESS.
MS. HANNAH: THANK YOU. THE PEOPLE CALL AGENT KIRK.
(THE WITNESS WAS DULY SWORN)
THE CLERK: THANK YOU. PLEASE BE SEATED IN THE WITNESS BOX.
WOULD YOU PLEASE STATE YOUR FULL NAME FOR THE RECORD, SPELLING YOUR FIRST AND LAST NAME.
THE WITNESS: STEPHEN KIRK, S-T-E-P-H-E-N K-I-R-K.
THE CLERK: THANK YOU.

STEPHEN KIRK

CALLED AS A WITNESS ON BEHALF OF THE PROSECUTION, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MS. HANNAH:
Q. AGENT KIRK, WHERE ARE YOU EMPLOYED?
A. POLICE DEPARTMENT IN THE CITY OF EL CAJON.



Q. HOW LONG HAVE YOU BEEN SO EMPLOYED?

A. 15 YEARS.

Q. WERE YOU ON DUTY ON MARCH 19TH OF THE YEAR 2004?

A. YES, MA'AM, I WAS.

Q. DID YOU RESPOND TO A LOCATION OF 425 EAST MAIN STREET?

A. YES, MA'AM.

THE COURT: PROCEED.

BY MS. HANNAH:

Q. WHEN YOU ARRIVED AT THAT LOCATION, WHAT DID YOU FIND?

A. OFFICER HOLMES AND SERGEANT COIT WERE ALREADY ON THE SCENE. THERE WERE TWO BLACK MALES. I BELIEVE, AT THAT

BELIEVE IT WAS A FOUR DOOR, SITTING IN A PARKING SPOT RIGHT



IN FRONT OF APARTMENT NO. 5.

Q. AND YOU RECALL WHETHER OR NOT THERE WERE ANY OTHER OFFICERS AT THE SCENE WHEN YOU ARRIVED OTHER THAN AGENT COIT AND OFFICER HOLMES OR SERGEANT, EXCUSE ME, COIT?

A. THAT'S ALL I REMEMBER WHEN I ARRIVED. I KNOW

Q. WHEN YOU ARRIVED AT THE SCENE, DID THE OTHER OFFICERS HAVE THEIR GUNS OUT OR ANYTHING OF THAT NATURE?

A. OFFICER HOLMES HAD HIS GUN OUT, YES.

Q. DID YOU EVENTUALLY SEE OFFICER HOLMES OR ONE OF THE OFFICERS PLACE ONE OF THE BLACK MALES INTO HANDCUFFS?

A. YES, I DID.

Q. DO YOU SEE THE PERSON THAT HE PLACED INTO HANDCUFFS IN THE COURTROOM TODAY?

A. YES.

Q. CAN YOU POINT THAT INDIVIDUAL OUT AS TO WHERE

A. HE'S SITTING AT THE DEFENSE TABLE.

THE BLACK MALE.

THE COURT: IDENTIFYING THE DEFENDANT, MR. BURTON.

BY MS. HANNAH:

Q. AFTER THE DEFENDANT WAS PLACED INTO HANDCUFFS, DID YOU HAVE A CONVERSATION WITH THE DEFENDANT?

A. A SHORT CONVERSATION, YES.

Q. WHAT WAS THE NATURE OF THAT CONVERSATION?





Q. WHEN YOU ASKED HIM ABOUT THE ALLEGED WEAPON, ABOUT A

A. I ASKED HIM WHERE THE ALLEGED WEAPON WAS,

A. I ASKED HIM WHERE THE ALLEGED GUN WAS HE USED IN THE

MR. ADAIR: OBJECTION, YOUR HONOR. LEADING.

THE COURT: OVERRULED.

BY MS. HANNAH:



Q. APPROXIMATELY WHERE WERE YOU STANDING IN REFERENCE TO THE DEFENDANT WHEN YOU HAD THIS EXCHANGE?

A. I WAS STANDING PROBABLY ABOUT FIVE OR SIX FEET AWAY FROM HIM.

Q. WHERE WAS THE DEFENDANT POSITIONED WHEN YOU WERE ASKING THESE QUESTIONS?

A. HE WAS STILL IN THE PARKING LOT.

Q. WAS HE STANDING? WAS HE SITTING?

A. I BELIEVE HE WAS SITTING.





Q. WHEN YOU WENT INTO THE APARTMENT, DID YOU FIND ANYTHING?

A. YES, I DID.

Q. DID YOU SEARCH THE REST OF THE APARTMENT?

A. YES, I DID.





Q. [redacted], DID YOU SEARCH THE DEFENDANT'S VEHICLE?
A. YES, I DID.
Q. AND DID YOU FIND ANYTHING INSIDE OF THE VEHICLE?
A. YES, I DID.
Q. WAS THE DEFENDANT STILL PRESENT WHEN YOU SEARCHED THE VEHICLE?
A. [redacted] I THINK HE HAD BEEN PLACED IN A VEHICLE. [redacted]

Q. AGENT KIRK, YOU INDICATED THAT YOU DID SEARCH THE DEFENDANT'S CAR; CORRECT?
A. YES.

Q. WHERE SPECIFICALLY INSIDE THE VEHICLE DID YOU FIND THE ITEMS?
A. THEY WERE INSIDE, [redacted], A BLACK



POUCH INSIDE THE GLOVE BOX.

Q. DID YOU ALSO PHOTOGRAPH THESE ITEMS?

A. YES, I DID.

Q. AND THEN DID YOU TAKE THESE ITEMS INTO CUSTODY OR INTO EVIDENCE?

A. YES, I DID.

MS. HANNAH: THANK YOU. NOTHING FURTHER.

CROSS-EXAMINATION

BY MR. ADAIR:

Q. AGENT KIRK --

THE COURT: MR. ADAIR, GO AHEAD.

BY MR. ADAIR:

Q. GOOD MORNING.

A. GOOD MORNING, SIR.

Q. AGENT KIRK, IT APPEARS IN THIS CASE THAT YOU BASICALLY COLLECTED EVIDENCE?

A. YES, I DID.

Q. TOOK PHOTOGRAPHS?

A. YES, SIR.

Q. ALL RIGHT. IS THAT -- WAS THAT YOUR RESPONSIBILITY ON THIS PARTICULAR INCIDENT?

A. YES, IT WAS.

Q. IS THAT WHAT YOU -- THE FUNCTION THAT YOU NORMALLY PERFORM FOR THE EL CAJON POLICE DEPARTMENT?

A. IT'S ONE OF MY FUNCTIONS, YES.

Q. ARE YOU ALSO A PATROL OFFICER OR --

A. WELL, AT THAT TIME I WAS ACTUALLY ACTING SERGEANT, [redacted]

Q. AT THE TIME THAT YOU ARRIVED ON THE SCENE, WAS MR. BURTON HANDCUFFED?

A. HE WAS IN THE PROCESS OF BEING HANDCUFFED, I BELIEVE.

Q. SO YOU WERE THERE FAIRLY QUICKLY; CORRECT?

A. YES, SIR.

Q. DO YOU REMEMBER A SECOND INDIVIDUAL BEING THERE ON THE SCENE THAT WAS NOT A POLICE OFFICER?

A. YES.

Q. AND WHO WAS THAT OTHER PERSON?

A. I DON'T RECALL HIS NAME, BUT THERE WAS ANOTHER BLACK MALE THERE.

Q. WOULD IT BE FAIR TO DESCRIBE HIM AS A YOUNGER MALE?

A. YES.

Q. YOUNGER THAN MR. BURTON?

A. HE LOOKED TO BE, YES.

[redacted]

Q. DIDN'T YOU ASK THAT INDIVIDUAL, "WHERE IS THE ALLEGED GUN?"

[redacted]

Q. AND REFERRING TO THE YOUNGER BLACK MALE?

A. CORRECT.



Q. DO YOU REMEMBER THAT YOUNGER INDIVIDUAL STANDING NEAR THE DOORWAY TO THE APARTMENT?

Q. YOU INDICATED THAT YOU DID SEARCH MR. BURTON'S CAR; CORRECT?

A. YES, SIR.

Q. COULD YOU DESCRIBE THE INTERIOR OF THE CAR AND CONTENTS IN GENERAL?

A. WELL, TYPICAL CAR. I DON'T REMEMBER THE EXACT COLOR . WHAT I LOCATED INSIDE THE GLOVE BOX WAS A BLACK POUCH WITH,

Q. DID YOU TAKE PHOTOGRAPHS OF THE INTERIOR OF THE CAR?

A. YES, I DID.




Q. WOULD IT BE FAIR TO SAY THAT THERE WERE A NUMBER OF ITEMS OF CLOTHING IN THE CAR?
A. I HAVEN'T REVIEWED THE PICTURE SINCE THE DAY I TOOK THEM. I CAN'T RECALL.
Q. DO YOU REMEMBER FINDING ANY INCENSE IN THE CAR?
A. IN WHAT?
Q. INCENSE. INCENSE IS SUCH AS YOU BURN TO PRODUCE A SMELL, A SCENT?
A. I DON'T RECALL FINDING ANYTHING.
Q. WAS THERE ALSO A BACKPACK THERE AT THE SCENE?
A. [redacted]. I DON'T RECALL SEEING ONE.
Q. DO YOU REMEMBER ANYTHING BEING ON TOP OF THE HONDA THAT YOU SEARCHED, PAPER, BACKPACK, ANYTHING?
A. ON TOP BEING --
Q. ON THE ROOF OF THE CAR.
A. I DON'T RECALL.
Q. DID YOU RECOVER ANY SUCH ITEMS FROM THE INSIDE THE CAR?
A. RECOVER AND TAKE AS EVIDENCE?
Q. YES.
A. I DON'T BELIEVE SO. I COULD REFER BACK TO MY REPORT TO REFRESH MY MEMORY.
Q. COULD YOU TAKE A LOOK AT YOUR REPORT, PLEASE.
A. OKAY.
Q. DOES THAT REFRESH YOUR MEMORY?
A. SOMEWHAT.





False evidence

Q. HOW WOULD YOU ANSWER THE QUESTION AT THIS TIME THEN?
A. I WOULD HAVE TO SAY I DON'T RECALL TAKING ANYTHING ELSE FROM A BACKPACK.
Q. OKAY. DO YOU KNOW WHERE THE CAR IS NOW?
A. THE LAST TIME I SAW THE CAR IT WAS AT THE TOW YARD.
Q. HOW LONG AGO WAS THAT?
A. IT WOULD HAVE BEEN A COUPLE MONTHS AGO.
MR. ADAIR: NO FURTHER QUESTIONS. THANK YOU, OFFICER.
THE WITNESS: THANK YOU, SIR.
THE COURT: MISS HANNAH, ANY REDIRECT?
MS. HANNAH: JUST BRIEFLY.

REDIRECT EXAMINATION

**MR. TROCHA:** THANK YOU, YOUR HONOR. THE PEOPLE WOULD LIKE TO CALL AGENT KIRK.

(THE NEXT WITNESS ENTERS THE COURTROOM.)

**THE CLERK:** YOU DO SOLEMNLY STATE THAT THE EVIDENCE YOU SHALL GIVE IN THIS MATTER SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP GOD?

**AGENT STEVEN KIRK,**

CALLED BY THE PEOPLE, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

**THE WITNESS:** I DO.

**THE CLERK:** THANK YOU. PLEASE BE SEATED IN THE WITNESS STAND.

WILL YOU PLEASE STATE YOUR FULL NAME SPELLING BOTH YOUR FIRST AND LAST FOR THE RECORD.

**THE WITNESS:** STEVEN ANDREW KIRK, K-I-R-K.

**DIRECT EXAMINATION**

**BY MR. TROCHA:**

Q. GOOD MORNING, AGENT KIRK.

A. GOOD MORNING, SIR.
Q. YOU'RE AN AGENT WITH THE EL CAJON POLICE DEPARTMENT?
A. YES, I AM.
Q. AND HOW LONG HAVE YOU BEEN AN OFFICER OF THE EL CAJON POLICE DEPARTMENT?
A. 15 YEARS.
Q. DID YOU WORK FOR ANY OTHER AGENCIES OTHER THAN EL CAJON?
A. NO, I HAVE NOT.
Q. YOU RECEIVED TRAINING ALSO IN THE AREA OF EVIDENCE COLLECTION IN RELATION TO CRIMINAL INVESTIGATIONS?
A. YES, I DID.
Q. WHAT DOES THAT TRAINING CONSIST OF?
A. PHOTOGRAPHING, DOCUMENTING CRIME SCENES, COLLECTING BLOOD SAMPLES, DIFFERENT TYPES OF EVIDENCE AT THE SCENES.
Q. ARE THERE CERTAIN DIFFERENCES WHEN IT COMES TO COLLECTING EVIDENCE FROM A SCENE THAT MAY BE AN AUTOMOBILE?
A. THAT MAY WHAT?
Q. MAY BE AN AUTOMOBILE OR A CAR.
A. SOME SUBTLE DIFFERENCES.
Q. SUCH AS?
A. WELL, PHOTOGRAPHING TECHNIQUES ARE A LITTLE DIFFERENT WITH THE LIGHTING AND SUCH LIKE THAT ON CARS.



Q. GOING BACK TO MARCH 19TH OF LAST YEAR, WERE YOU ON DUTY?

A. YES, I WAS.

Q. DID YOU RESPOND TO A CALL TO REPORT TO 425 EAST MAIN STREET IN EL CAJON?

A. YES, I DID.

Q. DID YOU CONTACT A PERSON THERE BY THE NAME OF



ERIC BURTON?

A. YES, I DID.

**BY MR. TROCHA:**

Q. THE HYUNDAI THAT YOU PREVIOUSLY DESCRIBED, WERE YOU ABLE TO DETERMINE WHO IT BELONGED TO?

A. YES, I WAS.

Q. AND WHO DID THE BELONG TO?

A. MR. BURTON.

Q. DID YOU HAVE OCCASION TO SEARCH THIS CAR?

A. YES, I DID.

Q. WHERE DID THIS SEARCH TAKE PLACE?

A. RIGHT IN FRONT OF MR. BURTON'S APARTMENT WHERE

Q. AT THE SCENE

A. YES.

Q. DURING YOUR SEARCH DID YOU TAKE PHOTOGRAPHS OF THE AREA SEARCHED IN THE CAR?

A. YES, I DID.

Q. DID YOU SEARCH THE GLOVE COMPARTMENT OF THIS



Q. SO FOCUSING YOUR ATTENTION NOW ON TO PEOPLE'S [redacted]

[redacted], PHOTO OF BLACK NYLON ZIPPERED POUCH, WAS MARKED FOR IDENTIFICATION.)

[redacted], PHOTO OF CLOSED RED BOX [redacted] PHOTO OF OPENED RED BOX [redacted] WAS MARKED FOR IDENTIFICATION.)

[redacted] PHOTO OF OPENED BLACK DRAWSTRING POUCH, WAS MARKED FOR IDENTIFICATION.)

[redacted], PHOTO OF BLACK NYLON ZIPPERED POUCH, BLACK DRAWSTRING POUCH, AND HEALTHSOURCE ID CARD, WAS MARKED FOR IDENTIFICATION.)

[redacted], PHOTO OF HEALTHSOURCE ID CARD, WAS MARKED FOR IDENTIFICATION.)

**THE WITNESS:** 100 WOULD BE THE BLACK ZIPPERED POUCH CONTAINING THE ITEMS I PREVIOUSLY DESCRIBED.

**BY MR. TROCHA:**

Q. AND THE OTHER FIVE EXHIBITS ARE WHAT WAS FOUND INSIDE THIS POUCH?

A. YES.

Q. IN ADDITION, THIS IS THE BLACK LEATHER POUCH [redacted]

A. THAT'S CORRECT.



Q. [illegible].

[illegible], PHOTO OF HEALTHSOURCE ID CARD, WAS MARKED FOR IDENTIFICATION.)

[illegible], PHOTO OF CLUB SYCUAN CARD[illegible])

**THE WITNESS:** THOSE ARE THE TWO FORMS OF THE IDENTIFICATION I FOUND INSIDE THE NYLON POUCH.

**BY MR. TROCHA:**

Q. FORTUNATELY, WE ALSO HAVE A BLOWUP OF THIS.

[illegible]

Q. SHOWING YOU WHAT'S BEEN MARKED AS PEOPLE'S [illegible] IT'S FOUR PHOTOGRAPHS LABELED A THROUGH H.

[illegible], PHOTOBOARD WITH EIGHT PHOTOS, WAS MARKED FOR IDENTIFICATION.)

**BY MR. TROCHA:**

Q. CAN YOU SEE THAT OKAY?

A. YES, I CAN.

Q. [illegible], IS THIS THE INTERIOR OF THE CAR AS YOU FOUND IT?

A. YES.

Q. AND PEOPLE'S B IS THE GLOVE COMPARTMENT AS YOU [illegible]

A. THAT'S CORRECT.

Q. AND THE REST OF THESE ARE THE PHOTOS OF THE POUCH ITSELF AND WHAT WAS FOUND INSIDE THE POUCH,

CORRECT?

A. YES, SIR.

Q. YOU SEIZED THE ITEMS DEPICTED IN C, D, E, F, G, AND H INTO EVIDENCE?

A. YES, I DID.

Q. SHOWING YOU NOW WHAT'S BEEN MARKED AS PEOPLE'S 152.

(PEOPLE'S EXHIBIT 152, BLACK NYLON ZIPPERED POUCH, WAS MARKED FOR IDENTIFICATION.)

**BY MR. TROCHA:**

Q. DO YOU RECOGNIZE PEOPLE'S 152?

A. YES, I DO.

Q. AND WHAT IS IT?

A. IT'S THE BLACK ZIPPERED NYLON POUCH THAT WAS INSIDE THE GLOVE BOX.

Q. ASIDE FROM THE FACT THAT IT'S NOW EMPTY, DOES IT APPEAR TO YOU IN THE SAME CONDITION THAT IT APPEARED ON THE DAY YOU SEIZED IT?

A. YES, IT DOES.

Q. I NOTE THERE'S A LOCK ON THE POUCH, CORRECT?

A. THAT'S CORRECT.

Q. WAS THAT LOCK THERE WHEN YOU FIRST FOUND IT?

A. YES, IT WAS.





Q. FINALLY, SHOWING YOU WHAT'S BEEN MARKED AS PEOPLE'S 160 AND 161; 160 REFERRING TO THE POUCH,

(PEOPLE'S EXHIBIT 160, BLACK DRAWSTRING POUCH, WAS MARKED FOR IDENTIFICATION.)

, 40 ROUNDS OF .22-CALIBER AMMUNITION, WAS MARKED FOR IDENTIFICATION.)

**BY MR. TROCHA:**

Q. CAN YOU DESCRIBE WHAT IS CONTAINED WITHIN THAT EXHIBIT?

A. THAT'S THE BLACK DRAWSTRING POUCH AND AMMUNITION THAT WAS LOCATED INSIDE THE PREVIOUS EXHIBIT, THE ZIPPERED POUCH.

Q. REFERRING TO PEOPLE'S 152?

A. THAT'S CORRECT.

Q. NOW, IN THAT EXHIBIT, WHEN YOU FOUND THOSE ITEMS IN PEOPLE'S 152, WHERE WERE BOTH EXHIBITS IN RELATION TO EACH OTHER?

A. THE ROUNDS WERE INSIDE OF THE DRAWSTRING



POUCH.

Q. AND THE DRAWSTRING POUCH WAS INSIDE THE ZIPPERED POUCH?

A. THAT'S CORRECT.

WITHIN THAT POUCH?

A. YES,

Q. AND HOW MANY ROUNDS WERE CONTAINED?

A. 40.







Q. THANK YOU, OFFICER.

A. YES, I DID.

Q. WHERE EXACTLY DID YOU FIND THESE IN RELATION TO THE BLACK ZIPPERED POUCH?

A. THEY WERE IN THE DRAWSTRING POUCH,

BY MR. TROCHA:

Q. DO YOU RECOGNIZE THESE THREE ITEMS?

A. YES, I DO.

Q. WHAT IS THAT ITEM?

Q. HAVE YOU SEEN ONE OF THOSE BEFORE?

A. YES, I HAVE.



Q. DOES THIS APPEAR TO BE SOMETHING THAT YOU WOULD GET FROM SYCUAN CASINO?

A. YES, IT IS.

Q. FOCUSING YOUR ATTENTION ON TO PEOPLE'S 154.

A. YES.

Q. WHAT IS PEOPLE'S 154?

Q. PEOPLE'S 162 NOW.

Q. AND THESE THREE THINGS WERE FOUND WITH THE BULLETS, THE BOX OF BULLETS, AND THE BLACK POUCH INSIDE THE BLACK ZIPPERED POUCH?

A. THAT'S CORRECT.

Q. IN SEARCHING THE CAR DID YOU FIND ANY EMPTY SHELL CASINGS?

A. NO, I DID NOT.

Q. SPECIFICALLY, DID YOU SEARCH THE AREA OF THE DRIVER'S SIDE; PULLED THE SEAT, THE FLOORBOARDS, AND POPPED THE DOOR POCKET?

A. YES, I DID.

Q. DID YOU FIND ANY EMPTY SHELL CASINGS IN THAT AREA?

A. NO, I DID NOT.

Q. THANK YOU, OFFICER.



**MR. TROCHA:** NOTHING FURTHER.

**THE COURT:** CROSS-EXAM?

**MR. ADAIR:** YES, YOUR HONOR.

**CROSS-EXAMINATION**

**BY MR. ADAIR:**

Q. OFFICER, GOOD MORNING.

A. GOOD MORNING, SIR.

Q. OFFICER, YOU INDICATED THAT YOU SEARCHED THE HYUNDAI. AND IN ADDITION TO THE SEARCH, YOU TOOK PHOTOGRAPHS, CORRECT?

A. THAT'S CORRECT.

Q. AND THERE WERE ADDITIONAL ITEMS IN THE CAR OTHER THAN JUST THE ONES THAT YOU DESCRIBED, CORRECT?

A. THERE WERE ITEMS IN THE CAR, YES.



0124

argument

absence or denial of counsel U.S. Cal 1966 Independent of any other constitutional proscription, preventing attorney from consulting with client is violation of 6th amendt. right to assistance of counsel and excludes any statement obtained in it's wake U.S.C.A. const. amendt. 6. Miranda v. Arizona 86 S. Ct. 1602, 384 US 436

US cal 1966 Presence of counsel in cases presented would have been adequate protective device necessary to make process of police interrogation conform to dictates of privilege, its presence would have insured that statements made in government established atmosphere were not product of compulsion U.S.Ca. Const. amendt. 5, 6.

C.A. 9(Cal) 2004 Invocation of counsel sufficient to trigger protection of Edwards requires at minimum some statement that can reasonably be construed to be an expression of desire for assistance of attorney U.S.Ca. Const. amendts Paulino v. Castro, 371 F. 3d. 1083

Ca. Cal 2000 There is no good-faith exception to the exclusionary rule for police who do not act in accordance with governing law. U.S.CA Const. amendt. 4 U.S. v. Twilley 222 F. 3d 1092

0125

~~the product of compulsion subtle or otherwise." (Ibid. [illegible]) After the assertion of the privilege [illegible] police initiated attempts to interrogate him." [illegible] Mr. Burton invoked his right to counsel but [illegible] questioned.~~

III.

~~[illegible]~~ ; FRUIT OF THE POISONOUS TREE

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court, but that it shall not be used at all."(Silverthorne Lumber Co. V. United States (1920) 251 U.S. 385) Not only is it well established that evidence which is illegally obtained cannot be used (Angelo v. U.S. (1925) 269 U.S. 20), but Mapp v. Ohio (1961) 367 U.S. 643 and Wong-Sun v. United States (1963) 371 U.S. 471 instruct us that the "fruits" resulting from evidence seized or leads resulting from the evidence must also be excluded.

When it appears that the evidence has been unlawfully acquired, the heavy burden of establishing the admissibility of the evidence on the theory that it would have been acquired by the police independent of the unlawful acquisition rests on the prosecution )People v. Superior Court of Alameda County (1978) 80 Cal 3d 665

~~CONCLUSION~~

~~Mr. Burton respectfully [illegible] suppress the gun, bullets and other evidence seized~~ + vehicle ~~from his home as well as the notes, reports and the audio and video tape of his statements to the police station.~~

Eric Burton Defendant

X 5-23-05

(96)

argument continued.

0129

upon arrival at the E.C. Police Station on 19 MARCH 04 at approx 1600. The defendant envoked his 6th and 5th amendt rights clearly to officer Holmes his arresting officer as officer Holmes testified at the 1538.5 suppression hearing.

CA 9 (Cal) 2004 Miranda warnings do not suffice to purge the taint of police conduct that violates the 4th amendt. U.S.C.A. Const. amendt 4 U.S. v. Crawford, 372 F.3d, 1048

Ca Cal 2004 - all evidence found in house search conducted with anticipatory warrant that was constitutionally invalid for failure to list triggered event, and all statements made by suspect at time of search were excludible, since all occured either during illegal entry or as direct result of it, regardless of whether search ultimately might have been conducted in a manner consistent with valid warrant application and regardless of whether officers possessed curative documents during search U.S.C.A. Const. amendt 4. U.S. v. Grubbs, 377 F.3d 1072

Ca 9 Cal 1983. Physical evidence and statements obtained after person is under formal arrest or has been removed from place of temporary detention to custodial surroundings are inadmissable unless probable cause existed for arrest U.S. Ca. Const. amend 4. U.S. v. Woods, 720, F2d 1022.

Police Conduct Constitutes dentention rather than consensual encounter if reasonable person in defendants position would have believed he was not free to leave; encounter was invalid detention. Wilson v. Superior Court (1983) 34 C. 3d 777.

ERIC BURTON?

A. YES, I DID.

Q. DO YOU SEE MR. BURTON HERE IN COURT TODAY?

A. YES, I DO.

Q. COULD YOU TELL US WHERE HE IS SITTING AND WHAT HE'S WEARING?

A. HE'S SITTING DIRECTLY ACROSS FROM ME TO YOUR LEFT, WEARING A WHITE SHIRT AND GLASSES.

**MR. TROCHA:** YOUR HONOR, MAY THE RECORD REFLECT THE WITNESS HAS IDENTIFIED THE DEFENDANT?

**THE COURT:** IT WILL.

**BY MR. TROCHA:**

Q. THE HYUNDAI THAT YOU PREVIOUSLY DESCRIBED, WERE YOU ABLE TO DETERMINE WHO IT BELONGED TO?

A. YES, I WAS.

Q. AND WHO DID THE BELONG TO?

A. MR. BURTON.

Q. DID YOU HAVE OCCASION TO SEARCH THIS CAR?

A. YES, I DID.

Q. WHERE DID THIS SEARCH TAKE PLACE?

A. RIGHT IN FRONT OF MR. BURTON'S APARTMENT WHERE THE PEOPLE WERE PARKED.

Q. AT THE SCENE?

A. YES.

Q. DURING YOUR SEARCH DID YOU TAKE PHOTOGRAPHS OF THE AREA SEARCHED IN THE CAR?

A. YES, I DID.

Q. DID YOU SEARCH THE GLOVE COMPARTMENT OF THIS

0130

argument cont

Ca. 9 Cal 1971 assuming a valid basis for arrest, an illegal method of execution for example an unlawful forcible entry can result in the exclusion of any evidence obtained as a result of the officers illegal Conduct. U.S v. Cisneros, 448 F.2d. 298

Ca. 9(Cal) 2001 Murder defendants Sixth Amendment right to counsel was violated by the admission of evidence that was procured by a government agent who deliberately elicited incriminating information from defendant U.S.CA Const. amend 6. Brown v. Lindsey 16 Fed. appx.

Ca 9(cal) 2004 - Invocation of counsel sufficient to to trigger protection of Edwards requires at minimum some statement that can reasonably be construed to be an expression of desire for assistance of attorney U.S. CA Const. amend 5 Paulino. Castro 371 F. 3d 1083

ca 9 Cal 2002 Government agents must cease an interrogation whenever an arrestee indicates in any manner that he wishes to remain silent, and when an assertion is ambiguous, agents may not continue the interrogation without at least clarifying the assertion U.S.V. Munoz Elias, 39 Fed. appx 598.

Jaw Rev. 1951 Right to resist illegal arrest 39 C.L.R. 96.111.

U.S. Cal 1966 Presence of counsel in case presented would have been adequate protective device necessary to make process of police interrogation conform to dictates of privilege, his presence would have insured that statements made (cont'd) on next page.

Cont. from previous page established atmosphere were not in government product of compulsion U.S.C.A. Const. amend 5, 6, U.S Cal 1971. Subjective good faith belief would not in itself justify either arrest of person mistakenly believed to be person police had probable cause to arrest or search of apartment in which arrest took place. Hill v. California 91S.CT. 1106, 401 U.S. 797 28L. Ed. 2d. 484.

U.S Cal 1963 Quantum of information which Constitutes "probable cause" - evidence which would warrant a man of reasonable caution in belief that felony has been committed must be measured by facts of particular case in which legality of arrest is questioned Wong Sun v. U.S 93 ct 407

U.S. Cal 1966 Independent of any other constitutional proscription, preventing attorney from consulting with client is violation of Sixth Amendment right to assistance of counsel and excludes any statement obtained in its wake U.S.C.A. Const. amendt 6 Miranda v. Arizona 86 S ct. 1602 384 U.S. 436.

CA 9(cal) 2000 Though passenger lacked standing to challenge search of car directly, if he could establish that initial stop of the car violated the fourth amendment then the evidence that was seized as a result of that stop would be subject to suppression as fruit of the poisonous tree. U.S. Ca. const. amend 4. U.S v. Twilley 222 F 3d 1092

Ca 9(cal) 1993 In addition to evidence obtained directly through violation of 4th amend. "fruit" of such illegal conduct must also be excluded from trial U.S. Ca. Const. Amendt. 4. suppression of evidence (1975) agency misconduct a basis for 11 cal. W. L Rev. 393

ALSO, THERE WAS A MOTION THAT I WANTED TO FILE

TROMBETTA DISMISSING DUE TO LOSS AND DESTRUCTION OF THE ALLEGED CRIME SCENE EVIDENCE

THAT I MENTIONED. THAT'S GROUNDS FOR DISMISSAL,

SPOILATION?"

OH, ONE OTHER THING. I BELIEVE, BECAUSE I ~~UNDERSTAND THAT ON APPEAL, IN THE EVENT THAT I AM CONVICTED, THIS MARSDEN CAN BE USED ON APPEAL, AND I WANT TO MENTION~~ THAT I ALSO BELIEVE THAT THERE WAS A 2ND AMENDMENT VIOLATION